**Mitchell Mark ORR, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Waymon B. PITCHFORD, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 3–90–333–CR, 3–91–062–CR.**

Court of Appeals of Texas,
Austin.

Aug. 12, 1992.

Ben D. Sudderth, Comanche, for appellant.

Stephen H. Smith, Dist. Atty., 119th Judicial Dist., Richard O. Ely, II, Asst. Dist. Atty., San Angelo, for appellee.

Before POWERS, JONES and KIDD, JJ.

JONES, Justice.

After a joint trial, a jury convicted Mitchell Mark Orr and Waymon B. Pitchford, Jr., appellants, of theft. *See* Tex.Penal Code Ann. § 31.03 (1989). The jury assessed punishment for both appellants at ten years' imprisonment, probated for ten years, and a fine of $10,000. On appeal, appellants assert five points of error challenging the legal sufficiency of the evidence to support their conviction. We will reverse the convictions and reform the judgments to reflect acquittals.

## BACKGROUND

In October 1988 Randy Hutto contacted Tom McCann regarding several oil and gas wells that Pitco Energy Company was interested in selling. After gathering information regarding the wells and negotiating with Pitco, McCann eventually bought

eight or nine wells from Pitco for $325,000 on March 2, 1989.

According to McCann, his primary contact during the transaction was Hutto, who was working for a commission. Hutto would relay information between McCann and Pitco. McCann's other contacts with Pitco during the transaction were appellants Orr and Pitchford. Pitchford was the president of Pitco; however, there is no evidence in the record regarding what association Orr had with Pitco.

McCann's testimony regarding the negotiations for the purchase of the wells from Pitco is vague. At some point after Hutto contacted him in October 1988, McCann sent a request to Pitco asking for documentation regarding the production history of the wells, and Pitco sent McCann production reports that it had filed with the Texas Railroad Commission. McCann testified that he first talked to appellant Orr in October or November of 1988. At about this same time, McCann went out to inspect the wells.

McCann also went to Pitco's offices to inspect its files on the subject wells. It was during this trip to Pitco's offices that McCann first met and conversed with appellant Pitchford, the president of Pitco. McCann testified that Pitchford told him the wells were generating revenues of between $16,000 and $18,000 a month; he also testified that Pitchford told him Pitco had reworked the wells and that was why production from the wells had increased over what it was when Pitco obtained the wells in January 1988. McCann further testified that the documents he inspected at Pitco's offices appeared to show that Pitco had indeed reworked the wells and that production had increased.

On December 12, 1988, McCann sent a letter to Pitco offering to buy five producing wells and three or four non-producing wells for $150,000. Pitco rejected the offer. McCann testified that he then forgot about the deal until Hutto contacted him again a short time later and told him that Pitco had reworked another well and boosted production to about $20,000 a month. In mid-January 1989 Pitco again sent production records to McCann that showed production had increased.

McCann eventually agreed to purchase the wells for $325,000. On March 2, 1989, he delivered to Pitco's offices a bank money order in the amount of $298,000, payable to Pitco Energy Company. Another bank money order in the amount of $27,000 went to Hutto to pay him for his commission on the sale.

McCann took over operation of the wells at the beginning of March 1989. As shown below, the revenues from the sale of natural gas from the wells dropped immediately thereafter. The following list shows the revenues generated by the natural gas from the wells from May 1988 through February 1989, while Pitco still owned the wells:

| Date | Revenue |
|---|---|
| 05-23-88 | $ 5,720.37 |
| 05-25-88 | 12,038.86 |
| 06-23-88 | 7,570.15 |
| 06-24-88 | 12,449.73 |
| 07-26-88 | 16,923.96 |
| 08-25-88 | 23,038.16 |
| 09-26-88 | 17,943.07 |
| 10-27-88 | 20,936.30 |
| 11-23-88 | 11,836.93 |
| 12-07-88 | 8,372.48 |
| 12-28-88 | 12,796.23 |
| 01-06-89 | 5,157.17 |
| 01-26-89 | 23,186.92 |
| 02-23-89 | 558.63 |
| 02-24-89 | 19,786.74 |

As can be seen from the list below, the monthly revenues from the wells dropped noticeably from that point, except for the months of July and August 1990:

| Date | Revenue |
|---|---|
| 03-27-89 | $10,828.72 |
| 04-25-89 | 9,714.13 |
| 07-24-89 (for April and May production) | 20,625.29 |
| 07-26-89 | 8,260.11 |
| 08-25-89 | 10,495.49 |
| 09-26-89 | 9,025.73 |
| 10-23-89 | 1,016.53 |
| 10-25-89 | 8,748.20 |
| 11-28-89 | 9,510.25 |
| 12-28-89 | 11,829.60 |
| 01-25-90 | 8,951.67 |
| 02-26-90 | 12,587.15 |
| 03-27-90 | 10,165.62 |
| 04-25-90 | 8,386.72 |
| 05-25-90 | 7,850.65 |
| 06-25-90 | 8,921.53 |
| 07-25-90 | 16,508.86 |
| 08-24-90 | 20,712.52 |
| 09-26-90 | 5,690.45 |

McCann testified that when he received the April 1989 check for $9,714.13, he was surprised because he thought the check would be about twice that amount. He tried two or three times to contact Orr and Pitchford by phone, but could not reach them; nor did he get a return call after leaving a message with a secretary. McCann then contacted Sun Exploration & Production Company, the company purchasing the gas from the wells, and asked them why production had taken such a dramatic drop. In response Sun sent McCann copies of the gas-meter charts that it had interpreted to determine the production from the subject wells.

After further investigation, McCann believed that Orr and Pitchford had deceived him into buying the subject wells for $325,000 by providing him with false information concerning the true amount of natural gas the wells were producing. Based on the evidence provided by McCann and others familiar with the subject wells, the State eventually obtained a grand-jury indictment against Orr and Pitchford for theft.

At trial the State introduced evidence that sometime during the period when Pitco operated the wells—but before McCann took over their operation—certain production mechanisms on the wells had been arranged and manipulated in a way that gave false production readings. As a result, the wells were not producing as much natural gas as the production readings showed. The State's theory was that Orr and Pitchford knew the production reports that they provided to McCann during the negotiations were false, and that Orr and Pitchford used the false production records to deceive McCann into buying the wells for $325,000 when the wells were actually worth much less, if in fact they were worth anything at all. The jury apparently accepted the State's theory and convicted both Orr and Pitchford of theft.

## STANDARD OF REVIEW

Appellants challenge the legal sufficiency of the evidence to support their conviction. Accordingly, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Griffin v. State,* 614 S.W.2d 155, 159 (Tex.Crim.App. 1981).

## DISCUSSION

The indictment in the present case stated the following:

MITCHELL MARK ORR and WAYMON B. PITCHFORD, JR. . . ., on or about the 2nd day of March, A.D. 1989, . . . did then and there intentionally and knowingly appropriate, by acquiring and otherwise exercising control over tangible personal property, other than real property, to-wit: *cash money* of the value of more than $20,000.00 from Tom McCann, the owner, without the effective consent of the owner, and with intent to deprive the said owner of said property.

(Emphasis added.) With respect to both Orr and Pitchford, the trial court charged the jury with the following:

[I]f you believe from the evidence beyond a reasonable doubt that on or about MARCH 2, 1989, . . . the defendant . . . either

(a) by his own conduct did intentionally or knowingly appropriate, by acquiring and otherwise exercising control over tangible personal property, other than real property, to wit: *cash money* of the value of more than $20,000.00 from Tom McCann, the owner, without the effective consent of the owner, and with intent to deprive the said owner of said property,

OR

(b) acting with the intent to promote or assist the commission of the offense, the said defendant . . . solicited, encouraged, directed, aided, or attempted to aid [the other defendant] to commit the offense of FELONY THEFT, and that the said [other defendant] on or about MARCH 2, 1989, . . . did knowingly or intentionally appro-

priate, by acquiring and otherwise exercising control over tangible personal property, other than real property, to-wit: *cash money* of the value of more than $20,000.00 from Tom McCann, the owner, without the effective consent of the owner, and with intent to deprive the said owner of said property,

then you will find the defendant guilty of the offense of FELONY THEFT....

(Emphasis added.)

In their fifth point of error, appellants argue the State failed to prove beyond a reasonable doubt that they appropriated $20,000 in cash money from McCann as required by the indictment and jury charge. We agree.

As discussed above, McCann testified at trial that on March 2, 1989, he delivered two bank money orders to Pitco's offices to pay for the wells. The State introduced carbon copies of these money orders into evidence. There is absolutely no evidence in the record, however, that the money orders were ever negotiated by Orr, Pitchford, Pitco, or anyone else. This, we conclude, constituted a fatal variance between the indictment and the proof at trial.

In *Lieske v. State*, 60 Tex.Crim. 276, 131 S.W. 1126 (1910), the Court of Criminal Appeals was presented with a case very similar to the present cause. The defendant was indicted for appropriating $250 in current money of the United States by false pretenses. At trial the State offered evidence that the victim had given the defendant a check for $250. In reversing the defendant's conviction, the court held that the allegation in an indictment, alleging unlawful acquisition of money of the United States, will not be sustained by proof of the unlawful acquisition of a check for the same amount of money. *Id.* at 1127.

In *Wimer v. State*, 120 Tex.Crim. 576, 48 S.W.2d 296 (1932), the court was again presented with a situation where the defendant was indicted for unlawfully obtaining a certain amount of money of the United States from the victim, yet the State's evidence showed only that the victim gave the defendant a check for that amount. The defendant argued that this constituted a fatal variance between the indictment and the proof at trial. In rejecting the defen-

dant's argument, the court distinguished *Lieske:*

It is observed that the opinion in *Lieske v. State*, supra, fails to show that the accused in fact received the money on the check he obtained. Hence it would not appear that the check was simply an instrument through which the money was received. In the present case and the other cases to which reference has been made, the checks were cashed and the money obtained. Thus the checks were simply used as instruments through which the money was received. Disclaiming any intention to hold that a variance would not be presented in a case where it was alleged that money was acquired and the proof merely showed that a check was obtained without further showing that the money was obtained by cashing the check, the opinion is expressed that the facts of the present case bring it within the holding of *Robinson v. State*, supra [63 Tex.Crim. 212, 139 S.W. 978] [(1911)],[(1911)] and *King v. State*, supra [66 Tex.Crim. 397, 146 S.W. 543] [(1912)].[(1912)] These cases and the present case are distinguishable upon the facts from *Lieske v. State*, supra, in that in Lieske's Case it was not shown that the check was cashed, whereas, in the present case and the other cases referred to, the proof showed that the checks were in fact cashed and the money obtained. We are constrained to overrule appellant's contention that there is a fatal variance.

*Wimer*, 48 S.W.2d at 303.

Since *Wimer*, the Court of Criminal Appeals has continued to recognize the distinction between proof that a defendant merely obtained a check as opposed to proof that the defendant obtained a check, endorsed it, and cashed or otherwise negotiated it. *See, e.g., Jackson v. State*, 646 S.W.2d 225, 226 (Tex.Crim.App.1983); *Compton v. State*, 607 S.W.2d 246, 252 (Tex.Crim.App.1980) (opinion on motion for reh'g), *cert. denied*, 450 U.S. 997, 101 S.Ct. 1701, 68 L.Ed.2d 197 (1981); *Watkins v. State*, 438 S.W.2d 819, 821 (Tex.Crim.App. 1969); *Paiz v. State*, 167 Tex.Crim. 496, 320 S.W.2d 827, 828 (1959).

The State's reliance on *Grogen v. State,* 745 S.W.2d 450 (Tex.App.1988, no pet.), is misplaced. The court's opinion in *Grogen* did not specifically state whether the stolen checks in that case had been negotiated. Moreover, we assume they had been negotiated, because the two Court of Criminal Appeals cases relied on by the *Grogen* court, *Jackson,* 646 S.W.2d 225, and *Kirkpatrick v. State,* 515 S.W.2d 289 (Tex.Crim. App.1974), were both cases in which stolen checks had been negotiated.

The State also argues that a money order "is bearer paper and is the equivalent of cash." This argument is without merit. "Bearer paper" or a "bearer instrument" is an instrument that does not designate a specific payee, but instead is payable to "bearer" or to "cash," such that anyone possessing the instrument may negotiate it. *See* Tex.Bus. & Com.Code Ann. § 3.111 (1968). The two money orders in the present case were payable to "Pitco Energy Co" and "Venture Equipment Co." Therefore, the money orders were not "bearer paper." We hold that a check or money order that designates a specific payee is not the equivalent of cash. We do not address whether true "bearer paper" might be the equivalent of cash in this context.

In the present case the State presented evidence only that McCann delivered bank money orders to Pitco's offices; there is no evidence that the money orders were ever cashed or otherwise negotiated in any way by anyone. Therefore, there is no evidence that Orr or Pitchford used the money orders as instruments to obtain or exercise control over "cash money" as required by the indictment. Thus, we conclude that a fatal variance existed between the indictment and the proof at trial.

Appellants' fifth point of error is sustained. Therefore, we need not address their remaining points.

## CONCLUSION

Based on our foregoing discussion, we conclude, even after looking at the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found all of the essential elements of theft beyond a reasonable doubt as those elements were alleged in the indictment. Therefore, we reverse both appellants' convictions and reform each judgment to reflect an acquittal.