TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-96-00006-CR







Kenneth Lane Denton, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT


NO. 0922838, HONORABLE JON N. WISSER, JUDGE PRESIDING







A jury found appellant Kenneth Lane Denton guilty of theft and misapplication of fiduciary
property. See Tex. Penal Code Ann. § 31.03(a) (West 1994) and Act of May 27, 1985, 69th Leg., R.S.,
ch. 599, § 1, 1985 Tex. Gen. Laws 2244 (Tex. Penal Code Ann. § 31.03(e)(5)(B), since amended) (theft
of $20,000 or more); Tex. Penal Code Ann. § 32.45(b) (West 1994) and Penal Code, 63d Leg., R.S.,
ch. 399, sec. 1, § 32.45(c)(3), 1973 Tex. Gen. Laws 883, 941 (Tex. Penal Code Ann. § 32.45(c)(3),
since amended) (misapplication of $10,000 or more); see also Tex. Penal Code Ann. §§ 31.09, 32.03
(West 1994) (aggregation of amounts). (1) The district court assessed punishment for each offense at
imprisonment for ten years, suspended imposition of sentence, and placed Denton on community
supervision.

Denton brought forward twelve points of error in his brief, the first of which he withdrew
following oral argument. The remaining eleven points challenge the sufficiency of the evidence in several
respects, urge that evidence was erroneously admitted, and complain of certain procedural rulings. We
will overrule each point and affirm the judgments of conviction.


Background

Denton was found guilty of stealing and misapplying money belonging to the Texas
Department of Public Safety Officers Association (DPSOA). DPSOA was organized in 1974 to further
the interests of Department of Public Safety troopers. By 1986, it had outgrown its informal structure and
was in need of full-time professional management. Denton, a former member of the Texas legislature, was
hired as DPSOA's executive director effective July 1, 1986. As executive director, Denton supervised
DPSOA's other employees and had day-to-day control over the association's affairs, including its finances. 
Denton, in turn, answered to the association's board of directors, which met quarterly.

At its March 1987 meeting, the DPSOA board adopted certain policies drawn up by a
committee of which Denton was a member. Among other things, these policies required board approval
of all expenditures over $1000 and two signatures on all checks. The persons authorized to sign checks
were the president, secretary-treasurer, and executive director of the association. Mike Wiggins, then
secretary-treasurer of DPSOA, and Charlie Adams, then a board member and later president of DPSOA,
testified that two signatures had always been required on the organization's checks. They also testified that
it was the association's policy that all contracts were to be reviewed and approved by the board.

Effective September 1, 1988, a contract was entered into between DPSOA and South
Coast Associates, a Louisiana corporation with offices in New Orleans. South Coast had been organized
in June of that year by Catherine Chrestia and her sons, John and Sidney Chrestia. Sidney Chrestia
testified that his mother had recently retired from her job as a public relations officer for the mayor of New
Orleans, and South Coast was conceived as a vehicle by which she could continue working in the public
relations field. As it turned out, however, Catherine Chrestia had virtually no involvement in South Coast's
activities. Sidney Chrestia, who was employed full time as a sales representative for a building supply
company, was South Coast's secretary-treasurer and kept its books in his spare time. South Coast's
dealings with DPSOA were primarily handled by John Chrestia, who was also employed as an architect
in New Orleans.

Denton and John Chrestia were close friends. According to Chrestia, he and Denton began
discussing the idea of South Coast and DPSOA working together soon after South Coast was formed, but
Chrestia also testified that he had no specific ideas regarding the sort of services South Coast would
provide to DPSOA. Denton drew up the contract. No model of clarity, the contract called for South
Coast to organize and present fund-raising events or shows on DPSOA's behalf, to engage in "corporate
marketing" using DPSOA's name, and to sell civilian memberships in the organization (called associate and
booster memberships) through direct mail and telephone solicitations. The contract provisions relating to
the fund-raising events or shows were particularly murky, but appeared to provide for DPSOA and South
Coast to divide the proceeds from these events equally after all expenses were paid. Chrestia testified that
none of the shows or events contemplated by this portion of the contract ever took place. The contract
terms with respect to the corporate marketing and sale of associate and booster memberships were
somewhat clearer; each party was to receive fifty percent of the money received, with each assuming
responsibility for certain of the expenses incurred. (2)

The South Coast contract was signed on DPSOA's behalf by its president, Frank Holland. 
Holland testified that in the spring of 1988 (he could not be more precise regarding the date), he met
Denton at a San Antonio restaurant for dinner and to cosign some DPSOA checks. During the course of
the evening, Denton told Holland that "he had a little contract or something for little fundraisers" that needed
signing. There is no dispute that this was the South Coast contract. Denton did not explain the nature and
terms of the contract to Holland nor did he mention the name of South Coast. DPSOA had on previous
occasions, with board approval, held basketball games between professional football players and DPS
troopers, and Holland assumed that the "little fundraisers" mentioned by Denton were of that sort. The
restaurant was dark and Holland was not wearing his glasses. Holland signed the contract without reading
it, assuming that it would be presented to the board at its next meeting for formal approval. In fact, this was
not done and there was testimony that the board did not learn of the South Coast contract until the October
1989 board meeting.

DPSOA was South Coast's first client and Chrestia acknowledged that he had never
performed the sort of activities called for in the contract. Chrestia testified that his architectural design
business demanded his full attention and that he never intended to run South Coast's activities. Instead,
his plan was to hire people who knew what they were doing to work with DPSOA. Phil LeConte, who
Chrestia testified was in charge of South Coast's Texas operations, and Scott Eberz, described as
LeConte's assistant, were those people. Chrestia testified that South Coast's duties under its contract with
DPSOA "were going to be whatever [Denton's] staff and Phil [LeConte] would devise for themselves." 
Throughout his testimony, Chrestia displayed a lack of familiarity with the details of South Coast's dealings
with DPSOA, regularly suggesting that such questions should be asked of LeConte. 

LeConte and Eberz were interviewed and hired in Austin by Denton in September 1988
after responding to help-wanted ads placed by DPSOA. LeConte testified that Denton did not mention
South Coast when hiring him, that he assumed he was being hired by DPSOA, and that he learned he was
an employee of South Coast only after working for two weeks. Neither LeConte nor Eberz met John
Chrestia until later that fall. Chrestia testified that he did not supervise LeConte's activities. Instead,
LeConte supervised himself subject to directions from Denton. LeConte and Eberz worked in DPSOA's
Austin offices. South Coast did not pay rent to DPSOA or reimburse DPSOA for any of their office
expenses. South Coast paid LeConte and Eberz a salary plus a commission for each associate and booster
membership sold by DPSOA.

LeConte and Eberz prepared brochures and other materials for mailouts promoting
associate and booster memberships. LeConte testified that the printing and mailing expenses associated
with the membership promotions were paid by DPSOA. LeConte and Eberz also worked on an anti-drug
program called "Join the Move" (JTM). JTM was partially financed by the sale of jams and jellies, but its
principal funding came from corporate donations. LeConte testified that he sometimes showed John
Chrestia his work, but that Chrestia had no creative input and that the idea for JTM came from Denton. 
In late 1988, LeConte, Eberz, Denton, and Chrestia traveled to Washington, D.C., to meet with Alice
Sessions, wife of the then-director of the Federal Bureau of Investigation and a long-time friend of Denton. 
The purpose of the trip was to convince Sessions to serve as honorary chair of JTM. LeConte made the
presentation on behalf of DPSOA. Eberz and Sessions testified that Chrestia said little at this meeting and
that South Coast was never mentioned.

In the summer of 1989, LeConte conceived the idea for DPSOA to work in conjunction
with Miller Brewing Company on what was being advertised as "the biggest party in Texas history," to be
held in several locations in the state on the Labor Day weekend. LeConte testified that after reading in the
newspaper that the company was being criticized for promoting the consumption of beer on a busy holiday
weekend, he suggested that DPSOA arrange for off-duty troopers to serve as security guards at the "party"
locations. Miller accepted the idea and ultimately paid DPSOA $60,000 for this service. As in LeConte's
other activities on behalf of DPSOA, John Chrestia provided no input or supervision regarding the Labor
Day program. 

Mary Pat Becnel Holt first met John Chrestia in 1976, when they worked together in New
Orleans. In December 1988, while she was living in Denver, she was contacted by Chrestia and asked
if she would be interested in working for South Coast. Holt came to Austin to discuss this possibility with
Chrestia and Denton. Denton and Chrestia told Holt that they hoped to use South Coast's experience
working for DPSOA to obtain similar contracts from trooper associations in other states. Denton did most
of the talking at this interview. Holt agreed to work for South Coast and moved to Austin the following
month. Like LeConte and Eberz, Holt was to work out of DPSOA's offices.

When Holt arrived for her first day of work, Denton told her that she would not be
employed by South Coast, but would instead work for DPSOA as his administrative assistant. In that
capacity, Holt kept records of DPSOA's income and expenses, recorded new associate and booster
memberships, wrote checks for Denton's signature, and prepared reports for presentation to the
association's board. Holt also did work for South Coast. For example, she was sent to Denver by Denton
and Chrestia to make a presentation on South Coast's behalf to the Colorado troopers association. 
DPSOA paid Holt's expenses for this trip.

With respect to the JTM project, Holt testified that Denton instructed her never to mention
South Coast to Alice Sessions, the DPSOA board, or the corporate donors. As ordered by Denton,
South Coast also was not mentioned in the reports regarding JTM that Holt prepared for Sessions, the
board, and the donors. The reports also did not disclose that one-half of the money donated to the
program was being sent to South Coast. Holt testified that, on Denton's order, she altered JTM's financial
statements to hide the payments to South Coast. She also testified that all expenses associated with JTM
were paid by DPSOA.

Denton's prosecution was based on sixteen checks drawn on DPSOA bank accounts
between December 31, 1988, and October 10, 1989. The checks were payable to South Coast for an
aggregate amount of $67,201.88. Each check was signed by Denton, but only one was cosigned. The
other fifteen checks, totaling $62,201.88, were drawn on three DPSOA checking accounts opened by
Denton in September and November 1988. Each of these accounts required only one signature on checks,
and the only authorized signatory was Denton. The DPSOA board did not authorize these accounts and
did not learn of their existence until October 1989. The relevant details regarding these checks are as
follows:



 Eight checks, totaling $17,100.00, represented one-half the money received by DPSOA
for associate and booster memberships during the months of December 1988 though July
1989.

 Two checks, totaling $6115.13, were for amounts equal to one-half the associate and
booster memberships sold in August and September 1989 plus one-half the undesignated
individual donations received in July, August, and September of that year. Holt testified
that she included the donation money on Denton's orders. The South Coast contract did
not call for South Coast to receive a share of such donations to DPSOA.

 Three checks, totaling $38,250.00, were for one-half the corporate donations received by
DPSOA to support the JTM program. Holt testified that these donors were not told that
one-half the money would go to South Coast.

 One check, for $5000.00, was part of the money paid to DPSOA by Miller Brewing
Company for its part in the Labor Day promotion. This check was drawn on a preexisting
DPSOA account and was cosigned by Frank Holland, then the president of DPSOA. 
Holland testified that he did not remember signing this check, that Denton never discussed
South Coast with him, and that he did not agree to any payment to South Coast. Holland
testified that he sometimes signed DPSOA checks in blank for later use by Denton. 

 One check, for $189.75, bore a notation that it was from a concert in Waco. John
Chrestia testified that South Coast was not involved in this concert. He could not explain
why this payment was made.

 The remaining check was for $547.00. There is no evidence why this money was paid to
South Coast.




Holt testified that these payments to South Coast were not disclosed in the quarterly financial reports
prepared by her for submission to the DPSOA board. As with the JTM reports, Holt was told by Denton
to alter the financial statements so as to conceal the payments to South Coast.


Variance between pleading and proof

The indictments alleged that Denton stole and misapplied "lawful United States currency"
belonging to DPSOA. Denton contends the State failed to prove this allegation, at most showing only that
he appropriated and misapplied checks. Denton argues that absent proof he personally negotiated the
checks, there is a fatal variance between the indictments and the evidence. Denton relies on the opinion
of this Court in Orr v. State, 836 S.W.2d 315, 317-19 (Tex. App.--Austin 1992, no pet.).

In Orr, the two defendants fraudulently induced the complaining witness to purchase several
oil and gas wells owned by a company of which one of the defendants was president. Payment was made
by money orders purchased by the complainant and payable to the company. When the fraud was
discovered, the defendants were prosecuted and convicted for the theft of "cash money" in the amount of
the money orders. This Court reversed the convictions and ordered acquittals because there was no
evidence that the money orders were negotiated. We wrote:


[T]he State presented evidence only that [the complainant] delivered bank money orders
to Pitco's offices; there is no evidence that the money orders were ever cashed or
otherwise negotiated in any way by anyone. Therefore, there is no evidence that [the
defendants] used the money orders as instruments to obtain or exercise control over "cash
money" as required by the indictment.



Orr, 836 S.W.2d at 319.

Denton's reliance on Orr is misplaced, because the undisputed evidence shows that the
checks from DPSOA to South Coast were negotiated by South Coast. As we noted in Orr, when an
indictment alleges a theft of currency but the proof shows a check, there is no variance if the evidence also
shows that the check was cashed or otherwise negotiated. In such a case, the check was merely the
instrumentality by which appropriation of the currency was accomplished. See Jackson v. State, 646
S.W.2d 225, 226 (Tex. Crim. App. 1983); Kirkpatrick v. State, 515 S.W.2d 289, 293 (Tex. Crim. App.
1974); Orr, 836 S.W.2d at 318. 

Contrary to Denton's argument, it was not necessary for the State to prove that Denton
personally cashed or otherwise negotiated the checks made payable to South Coast. Theft requires proof
of an unlawful appropriation of property. Penal Code § 31.03(a). To "appropriate" means to acquire or
otherwise exercise control over property other than real property. See Tex. Penal Code Ann. §
31.01(4)(B) (West 1994). As the definition makes clear, proof that Denton appropriated DPSOA's
currency did not require evidence that he personally acquired the currency. See Freeman v. State, 707
S.W.2d 597, 605-06 (Tex. Crim. App. 1986) (evidence store employee delivered goods to another
knowing payment had not been made was sufficient to sustain employee's conviction for theft from store). 
The negotiated checks were the instrumentality by which Denton transferred possession of the currency
from DPSOA to South Coast. By signing the checks that were later negotiated by the payee South Coast,
Denton exercised control over and dealt with the currency in DPSOA's accounts. See Tex. Penal Code
Ann. § 32.45(a)(2) (West 1994) ("misapply" means to deal with property contrary to agreement or law). 
There is no variance between the pleading and the proof. Point of error two is overruled.


Sufficiency of evidence to sustain conviction for theft

A person commits theft if he unlawfully appropriates property with intent to deprive the
owner of property. Penal Code § 31.03(a). In points of error three and four, Denton contends the
evidence is legally and factually insufficient to sustain his theft conviction because the State did not prove
either that his appropriation of DPSOA's currency was unlawful or that he acted with the intent to deprive. 
He also contends that the State failed to prove that the value of the currency appropriated was $20,000
or more.


a. Standard of review

In determining the legal sufficiency of the evidence to support a criminal conviction, the
question is whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier
of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307 (1979); Geesa v. State, 820 S.W.2d 154 (Tex. Crim. App. 1991); Griffin v.
State, 614 S.W.2d 155 (Tex. Crim. App. 1981). When conducting a factual sufficiency review, the
evidence is not viewed in the light most favorable to the verdict. Instead, all the evidence is considered
equally, including the testimony of defense witnesses and the existence of alternative hypotheses. Orona
v. State, 836 S.W.2d 319, 321 (Tex. App.--Austin 1992, no pet.). A verdict will be set aside for factual
insufficiency only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust. Clewis v. State 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); Stone v. State, 823 S.W.2d 375,
381 (Tex. App.--Austin 1992, pet. ref'd as untimely filed). 


b. Unlawful appropriation

In the context of this cause, an appropriation of property is unlawful if it is without the
owner's effective consent. See Tex. Penal Code Ann. § 31.03(b)(1) (West 1994). Denton argues that
his authority as executive director, together with the terms of the South Coast contract, gave him DPSOA's
effective consent to make the payments to South Coast called for by the contract, and that the State did
not prove otherwise.

Fifteen of the sixteen checks were drawn on accounts established by Denton for which only
his signature was required on checks, a violation of the DPSOA board's two-signature policy. These
fifteen checks were signed only by Denton, another violation of the two-signature policy. Denton does
not deny that this policy formally existed, but argues that it was not followed in practice by anyone at
DPSOA. At trial, the defense introduced several checks drawn on DPSOA accounts and bearing only
the signature of Mike Wiggins (secretary-treasurer), Charlie Adams, or Frank Holland (each of whom
served as president). Each of these men testified that the checks in question should not have been issued
over one signature alone and that he had signed the checks assuming that another authorized person would
cosign. 

Holland also testified that Denton did not disclose the nature and terms of the South Coast
contract when he presented it to him to sign. To the contrary, Holland's testimony suggested that Denton
misrepresented the contract by describing it as "a little contract . . . for little fundraisers." Moreover,
Denton does not deny that the South Coast contract was not presented to the DPSOA board for approval,
a violation of another board policy. But he again argues that this was a policy not observed, citing two
other contracts entered into by DPSOA during the relevant time period: a contract with the publisher of
the association's magazine and a contract with the manufacturer of the jams and jellies sold to support the
JTM anti-drug program. Holland testified that the final versions of these two contracts were not reviewed
by the board before the contracts were signed, but that both the publisher and the manufacturer had
previously made presentations to the board and that the terms of the contracts had been discussed and
approved by the board.

There was also evidence that Denton sought to conceal the existence of the South Coast
contract and to hide the payments from DPSOA's board. Denton disputes this, arguing that "South Coast
was not a secret" to the DPSOA board. He points to evidence that DPSOA board members met John
and Sidney Chrestia at a national trooper's convention in Baton Rouge, Louisiana, and accepted an
invitation to travel to New Orleans with troopers from other states where they were entertained by South
Coast. He notes that South Coast also paid for a DPSOA "hospitality room" at another convention. The
issue, however, is not whether DPSOA board members had ever heard of South Coast or met John
Chrestia, but whether the board approved the South Coast contract and authorized the payments made
to South Coast by Denton. The evidence is uncontradicted that it did not.

It was for the jury, as trier of fact, to determine the credibility of the witnesses and the
weight to give their testimony. Castellano v. State, 810 S.W.2d 800, 807 (Tex. App.--Austin 1991, no
pet.); see Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979). There was evidence before the jury that
Denton did not have the authority to enter into contracts without the approval of the board and that he
never presented the South Coast contract to the DPSOA board for approval. Although the contract was
signed by DPSOA's president, there was evidence that his signature was secured by Denton's
misrepresentations regarding the nature of the contract. There also was evidence that Denton's authority
as executive director did not include the authority to issue checks over his signature alone, and that he did
not have consent of any kind to issue the fifteen single-signature checks to South Coast. Viewing this
evidence in the light most favorable to the verdict, the jury could rationally find beyond a reasonable doubt
that Denton made the payments to South Coast without DPSOA's consent, and hence that Denton's
appropriation of DPSOA's currency was unlawful. Viewing all the evidence equally, including that
favorable to the defense, the jury's finding that Denton acted without DPSOA's consent is not so against
the great weight of the evidence as to be manifestly unjust.

Further, the evidence would support a finding of unlawful appropriation even if we were
to accept Denton's contention that he was not bound by DPSOA board policies and had the board's
implicit consent to contract for fund-raising activities. John Chrestia testified that all of the ideas, work, and
other benefits Denton claims DPSOA received were provided by Phil LeConte, and that LeConte "was
South Coast" insofar as DPSOA was concerned. But South Coast did not provide LeConte's services
to DPSOA in any meaningful sense. To the contrary, the evidence shows that DPSOA provided LeConte
to South Coast. Both LeConte and his assistant Eberz were hired by Denton and worked in DPSOA's
offices under Denton's direction, receiving virtually no input from John Chrestia. All of the expenses related
to the work LeConte and Eberz did for DPSOA were paid by the association. The only real connection
LeConte and Eberz had with South Coast was their paychecks. Otherwise, they were for all practical
purposes employees of DPSOA. (3) Viewing this evidence in the light most favorable to the verdict, the jury
could find beyond a reasonable doubt that South Coast performed no services for DPSOA, that LeConte
and Eberz were treated as employees of South Coast merely to justify Denton's payments to South Coast,
and that any permission Denton had to make the payments to South Coast was induced by this deception. 
See Tex. Penal Code Ann. § 31.01(1)(A), (3)(A) (West 1994) ("deception" means creating false
impression of fact likely to affect judgment of another and that actor does not believe to be true; consent
not effective if induced by deception). Such a finding is not contrary to the great weight of the evidence
since the circumstances surrounding LeConte's and Eberz's employment were essentially undisputed.


c. Intent to deprive

Denton also contends the State failed to prove that he intended to deprive DPSOA of the
money paid to South Coast. He argues that he contracted with South Coast pursuant to his authority as
executive director to raise money for DPSOA, and that South Coast provided valuable services in
exchange for the payments. He asserts that this cause is nothing more than a dispute between DPSOA and
South Coast regarding the value of the services rendered, an issue that should be litigated in a civil suit.

Denton relies on Reed v. State, 717 S.W.2d 643, 646 (Tex. App.--Amarillo 1986, no
pet.), and Cox v. State, 658 S.W.2d 668, 671 (Tex. App.--Dallas 1983, pet. ref'd). In these cases, the
defendants contracted to perform services and received payments pursuant to the contracts. Later,
disputes arose over the adequacy of their performance and the defendants were prosecuted for theft. Both
appellate courts held that the State failed to prove lack of effective consent and intent to deprive, and
opined that the disputes were civil in nature. We find Reed and Cox to be factually distinguishable from
the cause before us.

"Deprive" means, among other things, to withhold from the owner permanently. See Tex.
Penal Code Ann. § 31.01(2)(A) (West 1994). Few property transactions do not involve the acquisition
of another's property with intent to deprive him of it. McClain v. State, 687 S.W.2d 350, 354 (Tex.
Crim. App. 1985). It is undisputed that South Coast negotiated the checks it received from DPSOA and
there is no evidence that Denton did not intend for South Coast to do so. A rational trier of fact could
conclude beyond a reasonable doubt that Denton intended for South Coast to keep the money it received
from DPSOA. Moreover, the jury's conclusion that Denton intended to deprive DPSOA of the money
is not against the great weight of the evidence. Indeed, there is no evidence to the contrary. 

What separates lawful acquisitive conduct from theft is whether the appropriation was
without the owner's effective consent. McClain, 687 S.W.2d at 354. We have held that the evidence in
this cause is both legally and factually sufficient to support jury findings that Denton unlawfully appropriated
DPSOA's currency by making unauthorized payments to South Coast for services not performed. 
Denton's contention that this cause is merely a civil contract dispute is without merit.


d. Amount appropriated

Denton contends the evidence is insufficient to support his theft conviction because the
State failed to prove that he unlawfully appropriated $20,000 dollars or more. He argues that "[t]here was
undisputed evidence that services were rendered in exchange for the checks sent to South Coast," that the
State offered no evidence as to the value of these services, and that there is accordingly no evidence that
South Coast's services were not worth the amount paid by DPSOA. 

We are not persuaded by this argument for several reasons. First, it is premised on
Denton's assertion that he was authorized to make the payments to South Coast and that this cause
presents nothing more than a dispute between DPSOA and South Coast as to the value of services
rendered. We have already explained why we reject this premise. Second, and contrary to Denton's
argument, the jury could reasonably find that South Coast provided no services of any value to DPSOA,
as we have also discussed. Finally, the only authority cited by Denton in support of his argument is United
States v. Beuttenmuller, 29 F.3d 973 (5th Cir. 1994), a federal prosecution of the officers of a defunct
savings and loan for conspiracy, bank fraud, and making false entries growing out of a complicated real
estate transaction. Given the dramatically different factual and legal circumstances of that case, we find
Beuttenmuller to be inapposite to the cause before us.

To repeat, the evidence is legally and factually sufficient to support the jury's determination
that Denton, by means of the checks issued to South Coast, unlawfully appropriated lawful United States
currency from DPSOA with the intent to deprive DPSOA of the currency. The aggregate value of the
currency so appropriated is undisputed: $67,201.88. It follows that the evidence is legally and factually
sufficient to prove that Denton unlawfully appropriated $20,000 or more. Points of error three and four
are overruled.


Sufficiency of evidence to sustain conviction for misapplication of fiduciary property

A person commits an offense if he intentionally or knowingly misapplies property he holds
as a fiduciary in a manner that involves substantial risk of loss to the owner of the property. Penal Code
§ 32.45(b). In points of error five and six, Denton contends the evidence is legally and factually insufficient
to sustain his conviction for misapplication of fiduciary property because the State failed to prove either that
he misapplied the property in issue or that there was a substantial risk of loss. He also contends the State
failed to prove that the value of the property misapplied was $10,000 or more. Denton does not deny his
status as a fiduciary with respect to DPSOA's funds.



a. Misapplication

"Misapply" means to deal with property contrary to the agreement under which the
fiduciary holds the property. See Penal Code § 32.45(a)(2)(A). An agreement, within the meaning of
section 32.45, is "a harmonious understanding or . . . arrangement . . . between two or more parties, as to
a course of action." Bynum v. State, 767 S.W.2d 769, 777 (Tex. Crim. App. 1989). The agreement
need not be in writing. Id. Denton urges that the State failed to prove that the payments he made to South
Coast violated any agreement by which he held the funds in DPSOA's bank accounts. He argues that the
DPSOA policies requiring board approval of all contracts and two signatures on all checks did not
constitute an agreement for the purpose of section 32.45 because (1) the evidence shows the policies were
not consistently followed and (2) the policies related to the manner by which the funds were expended
rather than to the purpose of the expenditures. 

We have already answered the first of these arguments adversely to Denton in our
discussion of the theft conviction. Denton's argument that section 32.45 does not apply to violations of
agreements regarding the manner by which fiduciary funds are to be expended, as distinguished from
agreements regarding the purpose for such expenditures, is not supported by citation to pertinent authority. 
In any event, the evidence supports the conclusion that Denton's payments to South Coast violated his
fiduciary agreement with DPSOA in both their manner and their purpose.

As we held in our discussion of the theft conviction, Denton's authority as executive
director over the financial affairs of DPSOA was subject to the requirements that all contracts be approved
by the board and all checks be cosigned. Viewing the evidence in the light most favorable to the verdict,
the jury could find beyond a reasonable doubt that the these policies were elements of the agreement by
which Denton held the funds in DPSOA's accounts. It is undisputed that Denton violated the policies. 
Thus, the evidence is legally sufficient to support a finding Denton violated his fiduciary agreement with
DPSOA in the manner in which he made the payments to South Coast. As we noted previously, the
credibility of the testimony regarding the board's policies was for the jury to determine and, considering
all the evidence before us, the jury's finding that an agreement existed and that Denton's conduct violated
the agreement is not so contrary to the great weight of the evidence as to be manifestly unjust.

Insofar as the purpose of the payments to South Coast is concerned, we have already held
that the evidence is legally and factually sufficient to support a finding that South Coast performed no
services for DPSOA. The jury could reasonably infer that Denton's fiduciary agreement with DPSOA did
not authorize him to make payments to South Coast for services not performed. It follows that the
evidence is legally and factually sufficient to support a finding that Denton misapplied DPSOA's funds by
making payments for a purpose that violated the agreement under which the held and managed the funds.


b. Substantial risk of loss

A substantial risk of loss, within the meaning of section 32.45(b), is one "that exists but
does not rise to the level of a substantial certainty. It need not have to be 'unlikely' that the property will
be recovered, but the risk of loss does have to be a positive possibility; . . . the risk must be, at least, more
likely than not." Casillas v. State, 733 S.W.2d 158, 164 (Tex. Crim. App. 1986). Denton argues that
the State failed to prove that his payments to South Coast created a risk of loss because DPSOA received
valuable services from South Coast in exchange for the payments. Denton cites Smith v. State, 752
S.W.2d 121, 125 (Tex. App.--Tyler 1986, pet. ref'd). In Smith, the defendant/trustee testified that he
used money he withdrew from the trust in violation of the trust agreement for the benefit of the beneficiary. 
The court of appeals held that this testimony, if believed, would have entitled the defendant to an acquittal,
and that the trial court erred by refusing to so instruct the jury. The court reasoned that even if the
withdrawals violated the trust agreement, there was no risk of loss if the beneficiary received the use and
benefit of the funds. Id. at 124.

Again, the evidence in this cause is legally and factually sufficient to support a finding that
South Coast provided no services or benefits of any value to DPSOA. Assuming Smith's interpretation
of section 32.45 is correct, the evidence is legally and factually sufficient to support the jury's finding that
Denton's payments to South Coast involved a substantial risk of loss to DPSOA because it received no
benefit from the payments.


c. Amount misapplied

Denton contends the State failed to prove that he misapplied $10,000 or more as alleged
in the indictment. In his brief, he refers us to the arguments he made in support of this contention with
respect to the theft conviction. We have already considered these arguments and found them to be without
merit. For the reasons previously stated, we find the evidence to be legally and factually sufficient to
support the finding that Denton misapplied $10,000 or more. Points of error five and six are overruled.


Sufficiency of evidence to support restitution order

The district court ordered Denton to pay $67,201.88 in restitution as a condition of
community supervision. In point of error nine, Denton contends this order does not have a factual basis. 
See Cartwright v. State, 605 S.W.2d 287, 289 (Tex. Crim. App. 1980) (due process requires that
restitution order have factual basis).

The $67,201.88 figure is the aggregate amount paid to South Coast by DPSOA as
evidenced by the checks signed by Denton. As in his challenges to the sufficiency of the evidence with
regard to the amount stolen and misapplied, Denton argues that DPSOA received valuable services from
South Coast which should be taken into account in determining restitution. As we have explained,
Denton's argument fails because the evidence supports the conclusion that DPSOA did not receive any
benefits under the South Coast contract. Point of error nine is overruled.


Misjoinder

Denton contends the offenses of theft and misapplication of fiduciary property were
improperly joined in a single indictment. He further contends the State was not entitled to obtain 
convictions for both offenses based on a single indictment and that one of the convictions must be set aside.

Denton did not object to the alleged misjoinder prior to trial, thereby waiving his right to
raise the matter on appeal. Nolte v. State, 854 S.W.2d 304, 307-08 (Tex. App.--Austin 1993, pet.
ref'd); Tex. Code Crim. Proc. Ann. art. 1.14(b) (West Supp. 1998). The opinions on which Denton relies,
Ex parte Pena, 820 S.W.2d 806, 808 (Tex. Crim. App. 1991), Fortune v. State, 745 S.W.2d 364, 368
(Tex. Crim. App. 1988), and Martinez v. State, 753 S.W.2d 165, 168-69 (Tex. App.--Beaumont 1988,
pet. ref'd), apply the rules of decision in effect before the adoption of article 1.14(b).

Even if the misjoinder contention were properly before us, it would be without merit. Two
or more offenses may be joined in a single indictment if the offenses arise out of the same criminal episode. 
Tex. Code Crim. Proc. Ann. art. 21.24(a) (West 1989). In addition, a defendant may be prosecuted in
a single criminal action for all offenses arising out of the same criminal episode. See Tex. Penal Code Ann.
§ 3.02 (West 1994). "Criminal episode" means, among other things, the commission of two or more
offenses pursuant to the same transaction or pursuant to two or more transactions that are connected or
constitute a common scheme or plan. See Tex. Penal Code Ann. § 3.01(1) (West 1994). As Denton
himself states in his brief, the theft and misapplication offenses arose out of the same conduct. They
therefore arose out of the same criminal episode. Once again, the opinions on which Denton relies were
decided under an earlier, narrower definition of "criminal episode." Point of error ten is overruled.


Motion to quash

Denton contends the district court should have granted his motion to quash the indictment. 
In particular, he urges that the allegation in the misapplication count that he dealt with the alleged property
"contrary to an agreement" was not sufficient to give him adequate notice of the charge against him. He
contends the State should have been required to specifically allege the agreement or agreements on which
it relied. Denton concedes that there is authority contrary to this contention. See Romine v. State, 722
S.W.2d 494, 501 (Tex. App.--Houston [14th Dist.] 1986), pet. ref'd, 747 S.W.2d 382 (Tex. Crim.
App. 1988). Denton asserts that Romine was wrongly decided. We do not share this opinion. For the
reasons stated in Romine, we hold that the district court did not err by refusing to quash the misapplication
count. Point of error eleven is overruled.


Business records

The State introduced voluminous documentary evidence, including the bank records of both
DPSOA and South Coast. The bank records were offered and introduced as self-authenticating business
records. See Tex. R. Evid. 803(6), 902(10). (4) Denton contends these exhibits were erroneously admitted
for several reasons.


a. Affidavits

First, Denton argues that the authenticating affidavits did not satisfy the requirements of rule
803(6). In order to understand this argument, it is necessary to point out that each of the three banks with
which DPSOA and South Coast did business had been acquired by either the Federal Deposit Insurance
Corporation (FDIC) or a successor bank. The records of the original banks thereby became the records
of the successor institutions, and the affiants were the records custodians for the successor institutions.

Four sets of bank records were authenticated by the affidavits of Kathryn Patton, the
custodian of records for the FDIC, receiver of Bank of the Hills, Austin, Texas. The affidavits state that
the attached documents were from the files of the FDIC, were formerly records of Bank of the Hills, and
were kept by the FDIC in the regular course of its business. Patton's affidavits conclude with the following
paragraph:


I am familiar with the normal commercial banking practices followed by an
organization such as Bank of the Hills, Austin, Texas. I have examined the said [number
of pages] of records of [FDIC], Receiver of Bank of the Hills, Austin, Texas, and they are
consistent with normal commercial banking practices and mandatory requirements in that
they appear to be records of activity in which it was the regular course of business of Bank
of the Hills, Austin, Texas, for an employee or representative of Bank of the Hills, Austin,
Texas with knowledge of the act, condition or event recorded to make the record or to
transmit information thereof to be included in such record and that the record of the act,
condition or event was made at or near the time or reasonably soon thereafter. [FDIC]
retains these records for its benefit and makes use of them in the same manner and for the
same purposes that it would records generated by its own employees. The records
attached hereto are exact duplicates of the originals.



Another set of bank records was authenticated by the affidavit of Adrian Rivera, the
custodian of records for Frost National Bank, receiver of First City, Texas, Austin, Texas. The affidavit
states that the attached documents were from the files of Frost National Bank and were formerly records
of First City, Texas, Austin, Texas. Except for the number of pages and the bank names, Rivera's affidavit
concludes with a paragraph identical to that quoted above. 

Two more sets of bank records were authenticated by the affidavits of Rhonda Richardson,
the custodian of records for Premier National Bank in Baton Rouge, Louisiana, assignee of American Bank
and Trust, New Orleans, Louisiana. The affidavits state that the attached documents were from the files
of Premier National Bank and were formerly records of American Bank and Trust. Except for the number
of pages and the bank names, Rivera's affidavits conclude with a paragraph identical in substance to that
quoted above. 

Denton argues that the authenticating affidavits are inadequate because they do not state
that the documents are records of the regularly conducted activities of the predecessor banks, but only that
they appear to be such records. In a related argument, Denton urges that the affiants were not shown to
have personal knowledge of the business practices at the predecessor banks. See Tex. R. Evid. 602.

The foundation for the admission of a business record under rule 803(6) may be laid by
any person who can credibly testify that the records satisfy the requirements of the rule. 2 Steven Goode,
Olin Guy Wellborn III & M. Michael Sharlot, Guide to the Texas Rules of Evidence: Civil and
Criminal § 803.11, at 146 (Texas Practice 2d ed. 1993) (hereafter "Guide to Rules"). It is not required
that the witness or affiant be the creator of the records or even an employee of the business. Huff v. State,
897 S.W.2d 829, 839 (Tex. App.--Dallas 1995, pet. ref'd); Mitchell v. State, 750 S.W.2d 378, 379
(Tex. App.--Fort Worth 1988, pet. ref'd). The witness or affiant need not have personal knowledge of
the contents of the records, but need only have personal knowledge of the mode of preparing the records. 
Huff, 897 S.W.2d at 839; Mitchell, 750 S.W.2d at 379. It suffices that the witness or affiant can testify
that the records generally satisfy the conditions of the rule. Guide to Rules § 803.11, at 146.

The foundation for qualifying a business record under rule 803(6) consists of four elements:
(1) the record was made and kept in the course of a regularly conducted business activity; (2) it was the
regular practice of the business activity to make the record; (3) the record was made at or near the time
of the event it records; and (4) the record was made by, or from information transmitted by, a person with
knowledge acting in the regular course of business. Guide to Rules § 803.11, at 145. In their affidavits,
Patton, Rivera, and Richardson state that they have personal knowlege of normal commercial banking
practices. They further state that it is a regular practice for commercial banks such as the predecessor
banks in question to keep records of the sort at issue in the regular course of business (elements one and
two), for an employee with knowledge of the act or event recorded to make the records or transmit the
information to the maker of the records (element four), and for the records to be made at or near the time
of the act or event recorded (element three). We conclude that the affidavits are based on the personal
knowledge of the affiants and that the facts stated are sufficient to support the admission of the records
under rule 803(6).


b. Best evidence

Next, Denton complains that the bank records were not originals, but copies, thus violating
the best evidence rule. Tex. R. Evid. 1002. As an exception to this rule, however, a duplicate is admissible
to the same extent as an original unless a question is raised as to its authenticity or in the circumstances it
would be unfair to admit the duplicate. Tex. R. Evid. 1003. Denton does not refer us to any place in the
record where a question as to the authenticity of the copies was raised and he does not raise such a
question on appeal. Further, he does not contend that admission of the copies was unfair. We also note
that rule 902(10) expressly authorizes the admission of "records or photographically reproduced copies
of such records . . . ." Denton's best evidence argument is without merit.


c. Confrontation

Finally, Denton urges that the admission of the bank records violated his right to confront
the witnesses against him. U.S. Const. amend. VI; Tex. Const. art. I, § 10. He concedes that the business
records exception to the hearsay rule is "firmly rooted" and that admission of hearsay evidence pursuant
to the exception does not violate the confrontation clauses. See Huff, 897 S.W.2d at 841-43. Denton
submits, however, that "business record affidavits are distinct." We understand Denton to argue that he
was denied the opportunity to confront the authenticating witnesses.

Denton cites no authority in support of this argument, which we find unpersuasive. The
effect of the rule 902(10) affidavits was merely to make a prima facie showing that the bank records were
what they purported to be. Guide to Rules § 902.1. This prima facie showing of authenticity was
rebuttable. See Reed v. State, 811 S.W.2d 582, 587 (Tex. Crim. App. 1991). Moreover, it was not rule
902(10) that made the bank records admissible. Instead, the records were admitted pursuant to the rule
803(6) business records exception. As Denton concedes, use of the business records exception to the
hearsay rule did not violate his confrontation right. Point of error seven is overruled.

 

Evidence of homosexuality

Over objection, the State was permitted to ask John Chrestia if he had been "romantically
involved" with Denton. Chrestia answered "yes." Denton contends this was inadmissible character
evidence. Tex. R. Evid. 404(a). He also urges that the probative value of this testimony, if any, was
outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. 

With certain exceptions not applicable here, evidence of a person's character or character
trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion. 
Rule 404(a). The testimony here was not offered or admitted to prove character conformity. The State
argued and the district court ruled that the relationship between Denton and Chrestia was admissible to
show Chrestia's bias as a witness. The rules of evidence grant a party great latitude to prove a witness's
bias. See Gonzales v. State, 929 S.W.2d 546, 549 (Tex. App.--Austin 1996, pet. ref'd); Tex. R. Evid.
613(b) (formerly Tex. R. Crim. Evid. 612(b)). The field of external circumstances from which probable
bias may be inferred is infinite. Jackson v. State, 482 S.W.2d 864, 868 (Tex. Crim. App. 1972). 
Another court of appeals has held that evidence of a witness's lesbian relationship with the defendant was
admissible to show the witness's bias. Vaughn v. State, 888 S.W.2d 62, 74-5 (Tex. App.--Houston [1st
Dist.] 1994), aff'd, 931 S.W.2d 564 (Tex. Crim. App. 1996).

In this cause, we need not decide whether the court abused its discretion by admitting the
challenged testimony because any error was rendered harmless when Denton elicited substantially similar
testimony from another witness. See Harris v. State, 784 S.W.2d 5, 15 (Tex. Crim. App. 1989). During
cross-examination of Mary Becnel Holt, defense counsel attempted to demonstrate that her decision to take
her concerns regarding the payments to South Coast to the DPSOA board was motivated by her jealousy
of Denton's relationship with Chrestia:


Q. One of the things you had told people repeatedly while you were at DPSOA was
about the deep feelings you had held for John Chrestia for years. Isn't that true?


. . .


Q. You even told Phil LeConte once how much you loved John. Do you remember that?


. . .


Q. And every time you looked at Lane, there was just a great big rock in your throat,
wasn't there?


A. Believe me, it wasn't. When I knew John, which you're forgetting, before Lane was
ever his lover, he had others before him. I knew John years before he knew Lane.


 And no, I never was romantically involved with John. I was never intimate with
John. And I never be [sic]. Number one, I liked men. Number two, he liked men. We
were best buddies, and that was it.



Counsel also attempted to suggest that Holt used homophobia against Denton:


Q. You knew a secret about Lane that no one else was in a position to divulge, didn't
you?


A. I never told them.


Q. Well, let's talk about what you did, oh, please, ma'am. You went up there and told
them they had a nest of queers down at that office in Austin, and that was how you
wrapped this around your accusation. That's what absolutely electrified those "Bubbas." 
Now, come on. That's the truth, isn't it?


. . .


Q. . . . You met individually -- you met individually with three of those board members
for the specific purpose of pouring that very poison into their ears, didn't you, ma'am?


A. No. . . .



Counsel's questioning of Holt was more than merely an effort to meet, destroy, or explain
Chrestia's previous acknowledgment that he and Denton were "romantically involved." See Thomas v.
State, 572 S.W.2d 507, 512-13 (Tex. Crim. App. 1978) (opinion on motion for rehearing) (harmful effect
of improperly admitted evidence not cured by accused's effort to meet, destroy, or explain it). Instead,
the defense used the homosexual relationship between Denton and Chrestia to impeach Holt's credibility,
just as the State used it to impeach Chrestia. Under the circumstances, Denton cannot be heard to
complain that evidence of his homosexual relationship with Chrestia should not have been admitted. Point
of error eight is overruled. 


Jury instruction

Finally, Denton urges that the district court erred by refusing to include in the jury charge
his requested definitions of "currency" and "check." He argues that he was harmed by this charge error
because the indictment alleged that he stole and misapplied currency, while the evidence showed that the
property was taken or misapplied in the form of checks. See Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1985) (op. on reh'g) (standard of review for charge error). We rejected Denton's
contention that there was a variance between the pleading and the proof in our discussion of point of error
two. For the reasons stated there, if the court erred by refusing to give the requested definitional
instructions, the error was harmless. Point of error twelve is overruled.

The district court prepared a separate judgment for each count of the indictment. The
judgments of conviction are affirmed.



 

 Mack Kidd, Justice

Before Justices Jones, Kidd and Davis*

Affirmed

Filed: August 13, 1998

Do Not Publish 





* Before Tom G. Davis, Judge (retired), Court of Criminal Appeals, sitting by assignment. See Tex.
Gov't Code Ann. § 74.003(b) (West 1988).
1. This appeal is governed by the penal statutes in effect at the time of the offense. For convenience,
we will cite present penal code provisions when they are substantively identical to the statutes then in effect.
2. A second contract between DPSOA and South Coast was signed on September 1, 1989. This
second contract is of no particular relevance to the issues raised in this appeal. In this opinion, all
references to the "South Coast contract" are to the September 1988 contract.
3. In fact, LeConte testified that he believed he was a DPSOA employee until he received his first
paycheck from South Coast.
4. The Texas Rules of Criminal Evidence in effect at the time of Denton's trial were repealed effective
March 1, 1998, upon the adoption of the Texas Rules of Evidence. In this opinion, we will cite the relevant
current evidence rules, all of which are identical to the corresponding former criminal evidence rules. 
Unless otherwise indicated, the rule numbers are unchanged.