**Dondre JOHNSON, Appellant**

v.

**The STATE of Texas, State**

**NO. 02–15–00357–CR**

Court of Appeals of Texas,
Fort Worth.

DELIVERED: December 8, 2016

Rehearing and Reconsideration En Banc
Overruled January 26, 2017

Discretionary Review Granted
May 3, 2017

4) Did United's second amended petition render HCAD's plea to the jurisdiction moot?

Robert K. Gill, Fort Worth, Texas, for Appellant.

Sharen Wilson, Criminal District Attorney; Debra Windsor, Chief of Post Conviction; Edward L. Wilkinson, Siddharth Moody, Harry White, Assistant Criminal District Attorneys for Tarrant County, Fort Worth, Texas, for State.

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

## OPINION

### LEE ANN DAUPHINOT, JUSTICE

A jury convicted Appellant Dondre Johnson of two counts of theft of property of the value of $1,500 or more but less than $20,000 and assessed his punishment at two years' confinement in a state jail and a ten-thousand dollar fine in each case. The trial court sentenced him accordingly, with the sentences running concurrently. In four points, Appellant challenges the sufficiency of the evidence to support his theft convictions, complains that the State improperly commented on his failure to testify, contends that the trial court violated his Sixth Amendment right to counsel by denying him his counsel of choice and interfering with an established attorney-client relationship, and argues that one judgment should be modified to delete the $10,000 fine because his sentences are concurrent. Because the evidence is insufficient to support Appellant's two theft convictions, we reverse the trial court's judgments and enter a verdict of acquittal on both counts.

### Background Facts

Appellant was married to Rachel Hardy, who owned and operated Johnson Family Mortuary (Rachel Johnson d/b/a Johnson Family Mortuary) ("the funeral home" or "the mortuary"). Appellant worked for Hardy at the funeral home. The business practices were abominable. Hardy also ran a tax business, Rachel J. Hardy d/b/a Mighty Dollar Tax Refund Service. She freely comingled personal funds with business funds from her businesses. Bill-paying was haphazard and sporadic.

The rent for the building housing the funeral home was $3,500 per month. Jim Labenz bought the property in February 2014, the funeral home's lease was due to expire soon thereafter, and Labenz was negotiating a new lease that included a $100 per month increase in the monthly rent. The funeral home paid $3,000 of the March 2014 rent to the previous owner, who did not deliver the payment to Labenz for some time. Because he had not received the rent due him, Labenz served an eviction notice at the funeral home on May 28, 2014. Appellant went to Labenz's office the following day and promised that the funeral home would pay the rent. When the funeral home failed to timely make its rent payment, Labenz changed a lock on the property. But he changed the lock on only one of four doors. The funeral home then paid Labenz the April rent on June 11, 2014, and he allowed the funeral home employees back into the building, but the

funeral home still owed back rent. No one paid the May rent.

By mid-July 2014, no one had paid any more rent. Because of a lack of activity around the funeral home and concern that Johnson Family Mortuary had abandoned the property based on its failure to pay, Labenz and his two business partners returned to the property. As they approached the building, they could smell a bad odor. One of the partners, a former firefighter, stated that the smell was from "some sort of decomposing body." When they went inside, they saw several bodies in the back of the building. They left the building to get away from the stench and called the police. The police found many bodies that had not been embalmed or refrigerated and that were in various stages of decomposition as well as ashes.

The record shows that the funeral home had a history of holding bodies for months, sometimes more than a year, before finally cremating them. The crematorium the funeral home used began accepting only cash from the funeral home because the funeral home had left an infant's body in the crematorium's refrigerated storage for five months before paying for the cremation.

The record also shows a near-total disregard for laws and customs in running the funeral home. The Texas Occupation Code requires every funeral home to have a licensed funeral director in charge (FDIC) who is legally responsible for the day-to-day operations of any funeral home and to file his or her name and license with the Texas Funeral Service Commission.[1] Although Appellant was not a licensed FDIC, he regularly performed the func-tions of an FDIC. The FDIC is required to obtain a death certificate no later than ten days after the date of death.[2] Further, the Texas Administration Code requires a funeral director to

> obtain an electronically filed report of death through a Vital Statistics Unit system or complete a report of death before transporting the body. The report of death shall within 24 hours be mailed or otherwise transmitted to the Local Registrar of the district in which the death occurred or in which the body was found.[3]

The funeral home briefly hired an FDIC but then used his license and password to obtain death certificates and other necessary documents even after he left the funeral home. The State points out that

> lengthy delays in obtaining the necessary documents were not unusual for Appellant and the Johnson Family Mortuary. The mortuary routinely waited days or even weeks to file a report of death, and often went months before they completed the process to obtain a death certificate.

The State also notes in its brief that "in 2013, an infant was not cremated for more than a year and a half" and that "[d]elays between several weeks and up to six months were not uncommon."

The theft counts in this case are based on the handling of four bodies; the complainants are the family members, including a family member's business, who contributed money for the services the funeral home was to have provided.

Count One of the indictment charged Appellant with theft from Margaret Fran-

---

1. *See* Tex. Occ. Code Ann. § 651.403 (West 2012).

2. *See* Tex. Health & Safety Code Ann. § 193.002 (West 2010), § 193.003 (West Supp. 2016).

3. 25 Tex. Admin. Code Ann. § 181.2(a) (West 2015) (Tex. Dep't of Health Servs., Assuming Custody of Body).

cois of property, to wit money, of $1,500 or more but less than $20,000, related to the agreement for the handling of the body of Patricia Baptiste. Count Two charged him with theft of money from eight complainants: Michelle Jones, Tony Jones, Connie Mabry, Little Texas, Eric Jones, and Lana Adewusi, who all contributed to the $3,025 paid the funeral home for "full service" arrangements for the body of Michelle's mother, Karen Pearl Jones; Desiree Williams, who paid the funeral home $300 for a memorial service and cremation for her infant son; and Fred Jones, who along with relatives paid and arranged for the funeral home to perform a wake, funeral, and cremation for his mother, Helen Jones.

In his first point, Appellant contends that the evidence is insufficient to support his theft convictions stemming from both Count One and Count Two.

## Sufficiency of the Evidence

### Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[4] This standard gives full play to the responsibili-ty of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.[5]

The trier of fact is the sole judge of the weight and credibility of the evidence.[6] Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.[7] Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict.[8] We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution.[9]

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt.[10]

### Substantive Law of Theft

A person commits theft if the person (1) unlawfully appropriates (2) property (3) with the intent to deprive (4) the owner of the property.[11] An appropriation of property is unlawful if it is without the owner's effective consent.[12] Consent is not effective if it is induced by deception or coercion.[13] To deprive is "to withhold property from the owner permanently or for so extended

4. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

5. *Id.*; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, —— U.S. ——, 136 S.Ct. 198, 193 L.Ed.2d 127 (2015).

6. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).

7. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

8. *Murray*, 457 S.W.3d at 448.

9. *Id.* at 448–49.

10. *Dobbs*, 434 S.W.3d at 170; *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

11. *See* Tex. Penal Code Ann. § 31.03(a) (West Supp. 2016); *Price v. State*, 456 S.W.3d 342, 346 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd).

12. *See* Tex. Penal Code Ann. § 31.03(b)(1) (West Supp. 2016); *Price*, 456 S.W.3d at 346.

13. *See* Tex. Penal Code Ann. § 31.01(3) (West Supp. 2016); *Price*, 456 S.W.3d at 346.

a period of time that a major portion of the value or enjoyment of the property is lost to the owner."[14] Deception is defined as

(A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;

(B) failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true;

(C) preventing another from acquiring information likely to affect his judgment in the transaction;

. . . ;

(E) promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue, without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.[15]

▬▬▬ The case now before this court is different from most theft cases in that it is based on contractual obligations. If theft occurs in connection with a contract, there must be proof that the defendant intended not to perform under the contract when he accepted the money for the performance or goods and, consequently, that the appropriation was the result of a false pretext, or fraud, and that the person intended to deprive the owner of the property when the property was taken; proof of a mere subsequent breach of contract will not suffice.[16] That is, every breach of contract does not provide the basis for a criminal prosecution for theft. This is consistent with the difference between fraud and breach of contract in the civil context: "Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made."[17] A breach of contract may be just a breach of contract. A deceptive trade practice may be simply a civil deceptive trade practice. But, as the State points out in its brief, "[t]he fact that partial or even substantial work has been done on a contract will not invariably negate either the intent to deprive or the deception necessary to establish the unlawfulness of the initial appropriation."[18]

A contractor may still be convicted of theft under circumstances—to be sure, circumstances beyond the mere "failure to perform the promise in issue"—in which a rational fact-finder could readily conclude that he never intended, even at the outset, to perform fully or satisfactorily on the contract, and always harbored the requisite intent or knowledge to deceive his customer and thereby deprive him of the value of at least a substantial portion of the property thus unlawfully appropriated.[19]

14. Tex. Penal Code Ann. § 31.01(2)(A) (West Supp. 2016).

15. *Id.* § 31.01(1).

16. *See Taylor v. State*, 450 S.W.3d 528, 536 (Tex. Crim. App. 2014); *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012); *Price*, 456 S.W.3d at 346.

17. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986).

18. *See Taylor*, 450 S.W.3d at 537.

19. *Id.*

Conversely, the amount of work performed can negate the intent to unlawfully deprive the complainant of the property at the time the contract was formed.[20]

### Count One: Sufficiency of the Evidence of Theft from Margaret Francois

Count One charged that Appellant "did . . . unlawfully appropriate, by acquiring or otherwise exercising control over property, to wit: money, of the value of $1,500 or more, but less than $20,000, with intent to deprive the owner, Margaret Francois, of the property." Francois paid Johnson Family Mortuary $1,500 by cashier's check, which she said she gave to Appellant on July 6, 2014, for the cremation of her aunt, Patricia Baptiste, who died June 30, 2014. Both the receipt and the cashier's check were dated July 7, 2014. Francois's brother was concerned that they would receive the wrong ashes, and he told her he wanted to be present at the cremation. When Francois told Appellant that her brother wanted to be present, Appellant told her that there would be an additional charge. She testified that she immediately abandoned that idea and told Appellant that they would not view the cremation.

The funeral home attempted to enter a report of death for Baptiste on July 1, 2014, using the former FDIC's number, but the system would not accept the information. The FDIC had resigned, and his number had been removed from the system. Baptiste had not been cremated when her body was discovered July 15, 2014. Appellant told investigators that Baptiste had not been cremated because he was waiting for Francois to make an extra payment so her brother could view the cremation.

Appellant argues that the evidence is insufficient to support the guilty verdict in Count One because he was charged with appropriation of the cash and not the check. The evidence shows that he possessed the check from Francois, not cash. The check was made out to and deposited in the account of Johnson Family Mortuary. Had the check been made out to Appellant, and had he negotiated the check, he obviously would have exercised control over the money.[21] But the evidence shows that Appellant was not a signatory on the funeral home account. He was not an owner of Johnson Family Mortuary. He argues that the check represented to him just that—a check over which only his wife could have exercised control. Proof of appropriation of a check is not proof of appropriation of money unless there is also proof that the accused negotiated the check.[22] Therefore, Appellant's argument continues, even though he possessed the check, which went through his hands, he in no way controlled the $1,500 that he is alleged to have stolen from Francois. Appellant concludes that there is insufficient evidence of appropriation as to Count One and that this Court should reverse the trial court's judgment as to that count and order an entry of acquittal.

The State argues that even if Appellant is not guilty as a principal, he is guilty as a party.[23] But if he is guilty as a party, there must be evidence of wrongdoing on his

---

20. *Ehrhardt v. State,* 334 S.W.3d 849, 855 (Tex. App.—Texarkana 2011, pet. ref'd).

21. *See* Tex. Penal Code Ann. § 31.01(4)(B) (West Supp. 2016) (providing that one definition of "appropriate" is "to acquire or exercise control over property").

22. *See Orr v. State,* 836 S.W.2d 315, 319 (Tex. App.—Austin 1992, no pet.) (acquitting Orr when money orders were made out not to him but to a company and there was no evidence that they were cashed or negotiated).

23. *See* Tex. Penal Code Ann. § 7.02(a) (West 2011).

wife's part.[24] That is, there must be evidence of Hardy's guilt of taking the $1,500 from Francois intending at the time not to perform the services the $1,500 fee was to pay for. We have searched the record and failed to find evidence of Hardy's guilt, and consequently of Appellant's guilt as a party, that would allow a rational jury to find the evidence sufficient to support Appellant's guilt beyond a reasonable doubt. The record reflects that, as the State argues, Appellant handled the day-to-day operations while his wife dealt mostly with accounts. But Appellant was an employee of the funeral home, not its owner. Hardy, although she was the owner, became less actively involved in the daily business of the mortuary as the years passed, and particularly in the four months before the police interviewed her in July 2014 because she gave birth to the couple's baby in 2014.

John Nganga, who had been licensed as a provisional funeral director, but not as a funeral director who could work without supervision, testified that he did work for the funeral home, picking up bodies, and he showed Appellant how to perform the computer entries for the necessary paperwork. Nganga testified to the names of FDICs whose log-in names he had used at the funeral home. He also testified that Appellant did most of the work at the funeral home and that after the first year, Appellant's wife was rarely there. He explained that she had "put the money in" to open the funeral home.

In the trial court, the State argued only that

> Parties. If Dondre Johnson took that money knowing the people weren't going to be cremated, there's ample evidence of that. And Rachel Hardy did something with that money, he's still a party to the offense. He knows at the time of the deprivation of the taking of the money that he's not going to fulfill it. He and his wife—he and his wife, Johnson Family Mortuary are not going to fulfill the terms of their contract.

The State appears to suggest that because Hardy "did something with that money," it is proper to infer that the "something" she did was to appropriate the money and we must infer that she did so intending that the body not be cremated.

The Texas Court of Criminal Appeals has discussed the proper use of inferences and presumptions, explaining,

> Under the *Jackson* test, we permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions.

> To correctly apply the *Jackson* standard, it is vital that courts of appeals understand the difference between a reasonable inference supported by the evidence at trial, speculation, and a presumption. A presumption is a legal inference that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt. For example, the Penal Code states that a person who purchases or receives a used or second-hand motor vehicle is presumed to know on receipt that the vehicle has been previously stolen, if certain basic facts are established regarding his conduct after receiving the vehicle. A jury may find that the element of the offense sought to be presumed exists, but it is not bound to find so. In contrast, an inference is a conclusion reached by considering other facts and deducing a logi-

cal consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

As stated above, juries are permitted to draw multiple reasonable inferences from the evidence (direct or circumstantial), but they are not permitted to draw conclusions based on speculation. Without concrete examples, it can be difficult to differentiate between inferences and speculation, and between drawing multiple reasonable inferences versus drawing a series of factually unsupported speculations. This hypothetical might help clarify the difference. A woman is seen standing in an office holding a smoking gun. There is a body with a gunshot wound on the floor near her. Based on these two facts, it is reasonable to infer that the woman shot the gun (she is holding the gun, and it is still smoking). Is it also reasonable to infer that she shot the person on the floor? To make that determination, other factors must be taken into consideration. If she is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor. But, if there are other people with smoking guns in the room, absent other evidence of her guilt, it is not reasonable to infer that she was the shooter. No rational juror should find beyond a reasonable doubt that she was the shooter, rather than any of the other people with smoking guns. To do so would require impermissible speculation. But, what if there is also evidence that the other

guns in the room are toy guns and cannot shoot bullets? Then, it would be reasonable to infer that no one with a toy gun was the shooter. It would also be reasonable to infer that the woman holding the smoking gun was the shooter. This would require multiple inferences based upon the same set of facts, but they are reasonable inferences when looking at the evidence. We first have to infer that she shot the gun. This is a reasonable inference because she is holding the gun, and it is still smoking. Next, we have to infer that she shot the person on the floor. This inference is based in part on the original inference that she shot the gun, but is also a reasonable inference drawn from the circumstances.

Inference stacking is not an improper reasoning process; it just adds unnecessary confusion to the legal sufficiency review without adding any substance. Rather than using the language of inference stacking, courts of appeals should adhere to the *Jackson* standard and determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.[25]

The State does not direct us to any evidence in the record that supports its position that Appellant acted as a party to his wife's wrongdoing. We have searched the record and have not been able to locate such evidence. For example, we found no written contracts that would have shown Appellant's wife what services he had agreed that the funeral home would perform when he accepted the check on behalf of the funeral home. Additionally, the record does not show evidence of an intent on

25. *Hooper v. State*, 214 S.W.3d 9, 15–17 (Tex. Crim. App. 2007) (citations and footnotes omitted).

the part of either Appellant or his wife not to perform the cremation at the time Appellant accepted the check. Francois entered into the contract with the funeral home by tendering the cashier's check payable to Johnson Family Mortuary on the afternoon of July 7, 2014. Her aunt's body was discovered on July 15, 2014, only eight days later.

The dissent is understandably upset by the facts of this case and urges us to "hold that appellant appropriated the cashier's check and the underlying money the cashier's check represented."[26] The dissent's urging, however, is based on an erroneous view of commercial paper law. Under Texas's enactment of the Uniform Commercial Code, a check is defined as a draft signed by the drawer, drawn on a bank and payable on demand, containing an unconditional promise or order to pay a sum certain in money. It is not money.[27] In this case, the check was a cashier's check by which the issuing bank promised to pay to the Johnson Family Mortuary the sum of $1,500 upon demand. The penal code states that an owner "is a holder in due course of a negotiable instrument."[28] A holder of a negotiable instrument is a "person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession."[29] A holder in due course must be a holder or have a security interest in the instrument.[30]

When Appellant possessed the check, he did not possess the $1,500. He "was in possession of a piece of paper worth, at the most, pennies."[31] As the *Heimlich* court explained, when a person works for a law firm (the court's example involved an attorney working as an independent contractor), the obligation to the client to perform the services and the right to payment belong not to the attorney performing the services but to the firm. The firm then compensates the attorney.[32] Similarly, even though a secretary of the law firm accepts a check for the law firm and performs services for the client, the law firm alone is responsible for the performance of the services contracted for and the law firm alone owns the right to payment for the services. Here, Appellant was an employee of the funeral home. The cashier's check was payable only to the funeral home and of no significant value except to the funeral home. The obligation to perform the contract with Francois was the obligation of the funeral home.

Applying the appropriate standard of review, we hold that the evidence is insufficient to support the jury's verdict as to Count One of the indictment.

**Count Two: Sufficiency of the Evidence of Theft from Michelle Jones, Tony Jones, Connie Mabry, Little Texas, Eric Jones, Lana Adewusi, Desiree Williams, and Fred Jones**

### Relevant Facts

Count Two charged that Appellant

did then and there unlawfully appropriate, by acquiring or otherwise exercising control over property, to-wit: money, of

---

**26.** Dissenting Op. at 202.

**27.** *See* Tex. Bus. & Com. Code Ann. § 3.104 (West Supp. 2016).

**28.** Tex. Penal Code Ann. § 1.07(a)(35)(B) (West Supp. 2016).

**29.** Tex. Bus. & Com. Code Ann. § 1.201(21)(A) (West Supp. 2016).

**30.** *Id.* § 3.302(a), (e).

**31.** *Heimlich v. State*, 988 S.W.2d 382, 385 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd).

**32.** *Id.* at 387.

the value of $1,500 or more, but less than $20,000, with intent to deprive the owners, listed below, of the property, and all the said property was obtained pursuant to one scheme or continuing course of conduct which began on or about the 27th day of March 2014, and continued until on or about the 6th day of May, 2014, and the owners of said property are as follows:

Michelle Jones

Tony Jones

Connie Mabry

Little Texas

Eric Jones

Lana Adewusi

Desiree Williams

Fred Jones

The allegations concerning complainants Michelle Jones, Tony Jones, Connie Mabry, Little Texas, Eric Jones, and Lana Adewusi relate to the agreement for the arrangements for the body of Karen Pearl Jones; the allegations concerning complainant Desiree Williams relate to the agreement for the arrangements for the body of her infant son; and the allegations concerning complainant Fred Jones concern the agreement for the arrangements for the body of Helen Jones. Appellant admits that he received cash from the Count Two complainants and that he agreed to perform services in addition to cremation. He also performed some services. He therefore argues that the evidence is insufficient to show that he intended to steal from the complainants when he entered into the agreements.

## Michelle Jones and Family

Karen Pearl Jones died March 26, 2014. After her mother died, Michelle and her aunt Lana paid Appellant $3,025 in cash for embalming, a wake, a memorial service, and cremation. Michelle had collected money from family members she had asked to contribute to the bill because her mother's insurance was not enough to cover the expenses and Michelle could not pay the balance herself. Appellant obtained a death certificate on April 7, 2014. He never secured the necessary documents for cremation. The funeral home provided a wake and a memorial service with an open casket. Appellant gave Michelle ashes that he represented were those of Karen Pearl Jones. But her body was found in the mortuary garage in July 2014. The ashes he had given Michelle were determined to be those of a woman who had died two years earlier.

## Desiree Williams

On Thursday, May 6, 2014, Desiree Williams, the mother of a premature baby who died the day he was born, May 1, 2014, paid Appellant three hundred dollars in cash for a cremation and funeral service. Appellant performed a funeral service for the infant and gave Williams's husband ashes after repeated inquiries from Williams and her husband, but the baby had not been cremated when Labenz discovered the decomposing remains of several bodies in mid-July 2014. The baby's remains were found in a plastic storage bin in the mortuary garage. Appellant had given the Williamses another baby's ashes.

## Fred Jones

After Helen Jones, Fred Jones's mother, died in April 2014, he paid Appellant $2,800 in cash for a wake, a memorial service, and cremation of his mother. The funeral home provided the wake and the memorial service with an open casket. But Helen Jones had not been cremated when her remains were discovered in the mortuary more than three months after she died.

## Application of the Law to the Facts

■ In every situation covered by Count Two, Appellant performed part of the contract. Memorial services and wakes were held for Karen Pearl Jones and Helen Jones. A funeral service was held for the Williams infant.

Every body in the funeral home's custody that was not cremated or buried was still being held by the funeral home, although in unspeakable condition. All the complainants had dealt with Appellant as the representative of the funeral home. Nevertheless, Appellant's pattern of behavior did not indicate an intent not to cremate the bodies at the time he received payment for those services. Rather, he repeatedly delayed sending the bodies for cremation. Clearly, at the time the police arrived at the mortuary, the mortuary had not completed all the services for which it had been paid. But there is no indication of deception other than the fact that we can assume the family members expected the funeral home to do its job in a workman-like and timely manner, and it did not do so. For example, the evidence shows that even after the FDIC left the funeral home, the funeral home continued to use his identification and password to complete necessary paperwork. As a further example, on July 1, 2014, there was an attempt to complete the paperwork necessary to begin the cremation process for Patricia Baptiste, the deceased person related to the complainant in Count One. The record reflects a history of problems with necessary paperwork, and long delays in completing mortuary services. But there is no evidence of an intent never to perform the services.

Intent may be inferred from the surrounding circumstances.[33] But the evidence must show that the defendant intended to deprive the owner of the property, the money paid for cremation in this case, at the time it was taken.[34] Although the State did prove unconscionable behavior on behalf of Appellant and the funeral home and Appellant's repeated lies to cover up this behavior, the State failed to prove an intent to perform only part of the services contracted for at the time Appellant received the money on behalf of the funeral home. We therefore hold that the evidence is insufficient to sustain Appellant's conviction on Count Two.

## Conclusion

Having held the evidence insufficient to support Appellant's convictions on both counts, we sustain his first point, which is dispositive of the entire case. We therefore do not address his remaining points.[35] Because we hold that the evidence is insufficient to support Appellant's theft convictions, we reverse the trial court's theft judgments and render a verdict of acquittal on both theft counts.

LIVINGSTON, C.J., dissents with opinion.

TERRIE LIVINGSTON, CHIEF JUSTICE, dissenting

The majority holds that the evidence is insufficient to convict appellant Dondre Johnson of two counts of theft and therefore acquits him of those charges. Because I conclude that a proper application of

**33.** *See Price*, 456 S.W.3d at 346.

**34.** *See Wirth*, 361 S.W.3d at 697; *see also Phillips v. State*, 640 S.W.2d 293, 294 (Tex. Crim. App. [Panel Op.] 1982) (holding that absent any evidence of deception by false impression of law or fact, contractor who failed to perform contract to build home addition was not guilty of theft but merely failure to perform the contract).

**35.** *See* Tex. R. App. P. 47.1.

evidentiary sufficiency principles requires us to hold that sufficient evidence supports the convictions, I respectfully dissent to the majority's opinion and judgment.

I believe that the majority opinion recites but incorrectly applies the *Jackson v. Virginia* evidentiary sufficiency standard, so the standard bears repeating here. 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The critical question in an evidentiary sufficiency review is whether, after viewing the evidence in the light most favorable to the guilty verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* Viewing the evidence in the light most favorable to the verdict means that we must defer to the jury's credibility and weight determinations. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). One product of the jury's exclusive role of assessing witnesses' credibility is that the jury "is free to believe or disbelieve the testimony of any witness, to reconcile conflicts in the testimony, and to accept or reject any or all of the evidence of either side." *Bottenfield v. State*, 77 S.W.3d 349, 355 (Tex. App.—Fort Worth 2002, pet. ref'd), *cert. denied*, 539 U.S. 916, 123 S.Ct. 2275, 156 L.Ed.2d 133 (2003). The jury's freedom to reject testimony applies even when the testimony is uncontroverted. *Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App.), *cert. denied*, 513 U.S. 1060, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994).

The State may establish guilt through circumstantial evidence alone. *Orr v. State*, 306 S.W.3d 380, 395 (Tex. App.—Fort Worth 2010, no pet.). Thus, the State may prove intent—the focus of the majority's conclusion that the evidence is insufficient—by circumstantial evidence. *See*

*Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (explaining that a jury may infer an appellant's intent from his acts and words). In fact, proof of a culpable mental state almost invariably depends upon circumstantial evidence. *Montgomery v. State*, 198 S.W.3d 67, 87 (Tex. App.—Fort Worth 2006, pet. ref'd). In assessing the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

The first count of appellant's indictment charged him with theft of between $1,500 and $20,000 from Margaret Francois. With respect to this count, appellant argues on appeal only that because Francois gave him a cashier's check made out to Johnson Family Mortuary rather than writing a check to appellant personally or giving him cash, he had "no control over the funds represented by the check [and] there is insufficient evidence that [he] appropriated [the] money."[1] *See* Tex. Penal Code Ann. § 31.03(a) (West Supp. 2016) (stating that a person commits theft by unlawfully appropriating property with the intent to deprive the owner of it); *see also id.* § 31.01(4)(B) (West Supp. 2016) (establishing that "[a]ppropriate" means to "acquire or otherwise exercise control over property"). Appellant emphasizes that he was not a signatory on the mortuary's checking account and that only his wife had access to the account; he contends that "even though [he] possessed the check, . . . he in no way controlled the [money] he is alleged to have stolen from [Francois]."

---

1. In other words, unlike his challenge to the conviction for the second count of theft, appellant does not contest whether he intended

to deprive Francois of the cashier's check by deception at the time he induced her to deliver it.

I would hold that appellant appropriated the cashier's check and the underlying money the cashier's check represented, as charged in the indictment. The State proved that appellant held himself out as a co-owner of the mortuary, that he did everything "but the paperwork" there,[2] that he negotiated contracts, that he signed documents that the mortuary submitted to the medical examiner's office, that he alone represented the mortuary in negotiating a lease, that he accepted cash from clients on behalf of the business and gave them receipts (including signing Francois's receipt), that he alone was the point person in conversations about paying rent and about eviction for failure to pay the rent (including making a "gentleman's handshake" agreement on rent matters), and that he assisted the police in identifying decomposing bodies (while his wife believed "there was only one body there"). Francois testified that she spoke only with appellant about services the mortuary agreed to provide for a decedent. Perhaps more significantly, the State also proved that appellant received funds from a bank account of the mortuary and that the mortuary's business account, including money representing the $1,500 paid by Francois, had withdrawals for personal expenses, including restaurants, cell phone expenses, a grocery store, gas stations, and other stores. A financial analyst testified that none of Francois's $1,500 was withdrawn by the mortuary to pay cremation expenses.

Appellant cites no authority supporting the proposition that he did not exercise control over the cashier's check or the money it represented merely because the check was not made out to him (and neither does the majority cite such authority). Instead, I would hold that when appellant exercised control over the cashier's check, he also exercised control over the money it represented, either on the mortuary's behalf or his own behalf, especially considering the facts above that show his primary management of the mortuary's business and the personal benefits he accrued from the mortuary's income. *See Grogen v. State*, 745 S.W.2d 450, 450 (Tex. App.— Houston [1st Dist.] 1988, no pet.) ("The Court of Criminal Appeals has repeatedly held that there is *no* variance between an indictment that alleges theft of 'money' and proof at trial that establishes theft of a 'check.' "); *see also* Tex. Penal Code Ann. § 7.23(a) (West 2011) ("An individual is criminally responsible for conduct that he performs in the name of or in behalf of a corporation or association to the same extent as if the conduct were performed in his own name or behalf."); *Freeman v. State*, No. 01–13–00343–CR, 2014 WL 2626728, at *3 (Tex. App.—Houston [1st Dist.] June 12, 2014, pet. ref'd) (mem. op., not designated for publication) (applying section 7.23(a) in a theft case); *Aguirre v. State*, Nos. 04–98–00718–CR, 04–98–00719–CR, 1999 WL 417943, at *4 (Tex. App.—San Antonio June 23, 1999, no pet.) (not designated for publication) (citing section 7.23 and explaining that to "determine whether an individual acquired or exercised control over property under the theft statute, the focus is on the person's intent, not the person's ability to own or exercise actual possession of the [property]").

I would hold that viewing the evidence in the light most favorable to the verdict,

---

**2.** One client testified that she never saw appellant's wife at the mortuary. The State proved that appellant's wife took a "back seat" to operations at the mortuary before the police became involved there. A man who helped the mortuary perform certain services testified that he "always dealt with [appellant]." An owner of a crematory that provided services for the mortuary testified that he "might have seen" appellant's wife once but that he "never really talked to her that much."

appellant appropriated Francois's property, and the evidence is therefore sufficient to support his guilt for count one. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789.

The second count of appellant's indictment charged him with theft of between $1,500 and $20,000 from several individuals. With respect to this count, appellant contends that the evidence is insufficient to support theft because it fails to show that he intended to unlawfully appropriate the individuals' money and deprive them of it at the moment he received it.[3] *See* Tex. Penal Code Ann. §§ 31.01(1)(E), (3)(A), .03(a), (b)(1); *Taylor v. State,* 450 S.W.3d 528, 536 (Tex. Crim. App. 2014) (explaining that a claim of theft made in connection with a contract requires proof that the appropriation was a result of a false pretext or fraud and that the "accused intended to deprive the owner of the property at the time the property was taken"); *Price v. State,* 456 S.W.3d 342, 346 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (stating the same and noting that intent may be inferred from the surrounding circumstances); *see also Merryman v. State,* 391 S.W.3d 261, 271–72 (Tex. App.—San Antonio 2012, pet. ref'd) ("In reviewing sufficiency of the evidence of this type of theft, the appellate court considers the events before, during, and after commission of the offense, as well as the defendant's actions which show an understanding and common design to commit the offense."). He emphasizes that he performed some services for the individuals named in count two, and he contends that this evidence shows that

he originally intended to complete the services.[4] He appears to argue that at most, the evidence shows that he breached a contract with the individuals, not that he committed theft against them.

The State argues that appellant's position amounts to a request for this court to reweigh evidence and to infer from his partial performance of services that he initially intended to complete the services, which is perhaps one reasonable inference but not the reasonable inference that the jury chose. *See Laster v. State,* 275 S.W.3d 512, 523 (Tex. Crim. App. 2009) ("As long as the verdict is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable."); *Raybon v. State,* No. 02–12–00071–CR, 2013 WL 4129126, at *5 (Tex. App.—Fort Worth Aug. 15, 2013, pet. dism'd) (mem. op., not designated for publication) ("[T]he jury was entitled to choose between two reasonable inferences, and we must defer to that choice.")

In 2014, appellant took $300 to provide for an infant's cremation, represented that the infant had been cremated, and gave ashes to the infant's mother, but the police later found the infant's decomposing body in the mortuary. Also in 2014, appellant took $2,800 to perform a wake, a funeral, and a cremation for a deceased woman. When the woman's son became concerned about the length of the wait for the cremation, he called appellant, and appellant told him that he had "sent her body off already" to the crematory and was waiting

---

**3.** Thus, with respect to this count, appellant does not contest the sufficiency of the evidence to prove that he appropriated others' property or to show the value of the property.

**4.** However, the fact that partial or even substantial work has been done on a contract will not invariably negate either the intent to deprive or the deception necessary to establish the unlawfulness of the initial appropriation.

*See Taylor,* 450 S.W.3d at 537. As the State posits, appellant could have intended to deprive customers of money designated for cremation while not intending to deprive them of money designated for other services that he later performed, and under the evidence in this case, such a finding by the jury would not be irrational.

for the state to issue a death certificate. The son later discovered that his mother's body was still decomposing at the mortuary. The son testified that "from day one in the funeral home, [appellant] lied" and that appellant "knew what was going on."

· The same year, a daughter contracted with the mortuary for cremation, a wake, and a funeral of her mother. Using money donated by friends and family, the daughter paid $3,025 to appellant. When the cremation took longer to complete than expected, the daughter repeatedly called appellant, who consistently said that the cremation of the mother was "not ready yet." Eventually, after a period of approximately six weeks, appellant told the daughter that her mother's cremains were ready, and the daughter received cremains. Later, however, the daughter discovered that her mother's decomposing body remained at the mortuary.

Similarly, Francois testified that she contracted with appellant for a cremation of her aunt, that she paid appellant $1,500, that appellant did not tell her at that time that the mortuary did not have a funeral director in charge (FDIC),[5] and that the cremation never occurred. The jury heard of similar accounts from other witnesses. The evidence also shows that appellant failed to enter information about some decedents into the Texas Electronic Registration (TER) system and that he could not have obtained a cremation permit without entering that information.

A detective who investigated these matters testified, "These people were being clearly deceived, in my opinion, and led to believe that things were happening with their loved ones that just wasn't happening and that was obvious.... I do believe there was theft, and I think that the investigation showed that as it played out."

As the State contends in its brief, deferring to the jury's resolution of competing inferences concerning appellant's intent, the jury could have inferred his intent to deceive customers of the mortuary from the moment he entered contracts with them by the facts that

the [mortuary] did not have an FDIC at the time he entered into the contract[s], which prevented it from obtaining a death certificate and other documents necessary to cremate remains; the mortuary's failure to have other, older remains cremated, or cremated in a timely manner; the poor financial position of the Johnsons' businesses; and ... [a]ppellant's representations ... that the ashes he had given [customers] were the ashes he had contracted to give them, when he knew they were not.

Applying the deferential standard of review properly—*see Matson*, 819 S.W.2d at 846—I would conclude that the evidence is sufficient to support appellant's conviction for count two. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

Because the majority's opinion and judgment reverse appellant's convictions and acquit him of two counts of theft although the evidence is sufficient to prove those crimes, I dissent from the opinion and judgment.

---

**5.** The evidence shows that toward the end of 2013 or the beginning of 2014, appellant contacted Michael Pierce about becoming the FDIC at the mortuary, that Pierce agreed to do so, and that Pierce later resigned as the FDIC after the mortuary used Pierce's license to hold a funeral service without allowing Pierce to make the funeral arrangement. The evidence also shows that after Pierce resigned as the FDIC, without his knowledge or permission, the mortuary continued to use his name and license to arrange funeral services.