

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0197-17

**DONDRE JOHNSON, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS
### TARRANT COUNTY

**WALKER, J., filed a concurring opinion in which KELLER, P.J., joined.**

### <u>CONCURRING OPINION</u>

In discussing whether there was sufficient evidence to support the jury's guilty verdict on Count I,[1] the majority and Judge Yeary's concurring opinions consider whether the evidence was sufficient to show that Appellant was guilty as a party either under section 7(a)(2) as charged, or under a section 7(a)(1) theory, respectively. However, the indictment did not charge Appellant as a party. The indictment alleged that Appellant committed the offense as a primary actor, and the jury's

---

[1] With regard to Count II, I agree with the majority opinion that the evidence shows Appellant intended to deprive the victims named in that count of their money intended to pay for cremation services, even if the evidence shows he performed other paid-for services. *See* Majority Op. at 6–8.

instructions authorized his conviction not just as a party but also as a primary actor. "[W]hen the trial court's charge authorizes the jury to convict on several different theories . . . the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories." *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003). The evidence is sufficient on the theory that Appellant was guilty as a primary actor, and for that reason I concur in the Court's decision to reverse the judgment of the court of appeals.

**Sufficient Evidence Shows Appropriation as a Primary Actor**

A person commits the offense of theft if he unlawfully appropriates property with the intent to deprive the owner of that property. TEX. PENAL CODE Ann. § 31.03(a). Appellant's argument on appeal, and again before this Court, is that the evidence is insufficient to support the guilty verdict because one of the elements of theft, appropriation, is not shown. "Appropriate" means:

> (A) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or
> (B) to acquire *or otherwise exercise control over* property other than real property.

TEX. PENAL CODE Ann. § 31.01(4) (emphasis added). Appellant argues that he did not exercise control over Francois's money because he was not the named payee on the check. Therefore, the argument goes, he could not have appropriated Francois's property.

In his brief to this Court and in his brief to the court of appeals, Appellant's argument relies upon *Newman v. State*, 115 S.W.3d 118 (Tex. App.—Texarkana 2003, no pet.). In *Newman*, the defendant was charged with theft of "United States currency in the form of a check," and he was convicted. *Id.* at 119–20, 121. On appeal, Newman argued that the evidence was insufficient because there was no proof that he actually controlled the money represented by the check. *Id.* at 121.

Appellant, in his brief, quotes the following passage in *Newman*:

> This argument, however, is without merit. First, the State indicted [Newman] for the theft of the check itself, not the funds represented by the check. This is an important distinction. Under the indictment, the State was required to prove [Newman] unlawfully appropriated a check worth $79,218.38, not to show that the funds represented by the check were ever actually controlled by [Newman].

Appellant's Reply Br. 9 (quoting *Newman*, 115 S.W.3d at 122). Appellant seizes upon this language and points out that he was indicted for theft of money, not a check. "In other words, Appellant may have exercised control over the check, but not the currency it represented." *Id.*

In essence, Appellant argues there is a fatal variance between the indictment alleging theft of money and the evidence showing theft of a check. But it is well-settled that there is no fatal variance between an indictment alleging theft of money and evidence showing theft of a check. *See Jackson v. State*, 646 S.W.2d 225, 226 (Tex. Crim. App. 1983); *Kirkpatrick v. State*, 515 S.W.2d 289, 293 (Tex. Crim. App. 1974); *Rick v. State*, 207 S.W.2d 629, 630 (Tex. Crim. App. 1947). A check is an instrumentality by which one receives money. *Jackson*, 646 S.W.2d at 226.

The court of appeals, however, found significant to the "control" issue the fact that Appellant did not negotiate Francois's check:

> Appellant argues that the evidence is insufficient to support the guilty verdict in Count One because he was charged with appropriation of the cash and not the check. The evidence shows that he possessed the check from Francois, not cash. The check was made out to and deposited in the account of Johnson Family Mortuary. Had the check been made out to Appellant, and had he negotiated the check, he obviously would have exercised control over the money. But the evidence shows that Appellant was not a signatory on the funeral home account. He was not an owner of Johnson Family Mortuary. He argues that the check represented to him just that—a check over which only his wife could have exercised control. Proof of appropriation of a check is not proof of appropriation of money unless there is also proof that the accused negotiated the check.

*Johnson v. State*, 513 S.W.3d 190, 196 (Tex. App.—Fort Worth 2016, pet. granted). To support that

last statement, the court of appeals cited *Orr v. State*, 836 S.W.2d 315, 319 (Tex. App.—Austin 1992, no pet.). The State argues that the court of appeals's reliance on *Orr* was mistaken. I agree.

In *Orr*, the evidence showed that the victim, McCann, purchased several oil and gas wells from Pitco Energy Company. *Id.* at 315–16. After the purchase, McCann realized that Orr and Pitchford, who was Pitco's president, provided false information about the wells' production. *Id.* at 317. Mechanisms on the wells had been manipulated, and consequently they reported greater production than what the wells were actually producing. *Id.* Orr and Pitchford were both charged with theft, and the State's theory at trial was that Orr and Pitchford knew the reports were false and used those false reports to deceive McCann into paying more for the wells than they were worth. *Id.* On appeal, Orr argued that the evidence was insufficient to show appropriation of "cash money," as alleged in the indictment, because McCann paid Pitco with money orders. *Id.* at 318. The Austin Court of Appeals agreed and held that there was a fatal variance. *Id.* Because there was no proof that the money orders were ever negotiated by anyone, the evidence was insufficient to show that "cash money" was appropriated from the victim. *Id.* at 319.

Assuming, for the sake of argument, that *Orr* was correctly decided, it was misapplied by the court of appeals in this case. Unlike *Orr*, in this case there was proof that Francois's cashier's check was negotiated. It was deposited by Appellant's wife. This simple fact makes *Orr* distinguishable, and other courts have distinguished *Orr* for the same reason. For example, in *Mueshler v. State*, the defendant was her workplace's office manager and bookkeeper and was responsible for receiving and paying the company's bills. *Mueshler v. State*, 178 S.W.3d 151, 152 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). The firm's owner frequently signed blank checks for Mueshler to use to pay the company's bills while he was away from the office. *Id.* Mueshler instead wrote several checks

from the business to herself and to her creditors. *Id.* Mueshler was convicted of theft, and on appeal she argued that there was insufficient evidence to support the verdict because the indictment alleged theft of cash money, and the proof showed theft by writing checks. *Id.* at 152, 153. In support of her argument, Mueshler cited to *Orr*. *Id.* at 155. The court of appeals in *Mueshler*, however, distinguished *Orr* because the "State introduced evidence that the unauthorized checks written by Mueshler were negotiated—such that the bank used cash from the firm's checking account to pay for them." *Id.* The court of appeals thus held that the evidence was sufficient to sustain Mueshler's conviction of theft of cash money. *Id.*

Similarly, the Austin Court of Appeals—the very same court that issued the opinion in *Orr*—distinguished *Orr* in *Denton v. State*, No. 03-96-00006-CR, 1998 WL 476459 (Tex. App.—Austin Aug. 13, 1998, pet. ref'd) (mem. op., not designated for publication). Denton was the executive director of the Texas Department of Public Safety Officers Association (DPSOA), and the evidence showed that he wrote a number of checks from DPSOA, payable to South Coast, a corporation organized and run by some of Denton's close friends. *Id.* at *1–2. Denton was convicted of theft, and on appeal he argued that there was a fatal variance between the indictment, which alleged theft of "lawful United States currency," and the evidence at trial, which showed checks. *Id.* at *1, 5. The Austin Court of Appeals found its *Orr* opinion distinguishable because the evidence showed that the DPSOA checks Denton wrote to South Coast were actually negotiated by South Coast. *Id.* at *5. Additionally, the court of appeals dismissed Denton's argument that the State had to prove that he personally negotiated the checks in order for the checks to be considered the same as lawful United States currency. *Id.* at *6.

Just as in *Mueshler* and *Denton*, in this case there was evidence that the check was

negotiated. Appellant's wife, Hardy, deposited Francois's cashier's check into the business's account. *Orr* is distinguishable.[2]

Chief Justice Livingston, dissenting to the court of appeals's majority below, argued that additional factors showed that Appellant controlled Francois's property. Appellant was heavily involved with the day-to-day aspects of the business:

> The State proved that appellant held himself out as a co-owner of the mortuary, that he did everything "but the paperwork" there, that he negotiated contracts, that he signed documents that the mortuary submitted to the medical examiner's office, that he alone represented the mortuary in negotiating a lease, that he accepted cash from clients on behalf of the business and gave them receipts (including signing Francois's receipt), that he alone was the point person in conversations about paying rent and about eviction for failure to pay the rent (including making a "gentleman's handshake" agreement on rent matters), and that he assisted the police in identifying decomposing bodies (while his wife believed "there was only one body there"). Francois testified that she spoke only with appellant about services the mortuary agreed to provide for a decedent.

*Johnson*, 513 S.W.3d at 203 (Livingston, C.J., dissenting). Chief Justice Livington's point is well-taken, and the jury would have been reasonable in inferring that Appellant actually controlled Francois's money through the business, which he exercised a great deal of control over.

Additionally, the dissent argued that, at the time Appellant exercised control over Francois's cashier's check, he also exercised control over the money it represented. *Id.* The court of appeals's majority disagreed with this assertion and concluded "[w]hen Appellant possessed the check, he did not possess the $1,500. He 'was in possession of a piece of paper worth, at the most, pennies.'" *Id.* at 199 (quoting *Heimlich v. State*, 988 S.W.2d 382, 385 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd)).

---

[2] My discussion of *Orr* and how that case is distinguishable from the case before the Court today should not be taken as tacit or implicit approval of the decision in that case. The court of appeals relied upon it, however, and the point is that the court of appeals misapplied the case it relied upon.

The property at issue in this case—Francois's cashier's check—was worth far more than mere pennies. Because Francois's cashier's check was not made payable to Appellant, the court of appeals declared that "[t]he cashier's check was payable only to the funeral home and of no significant value except to the funeral home." *Id.* In *Simmons v. State*, we similarly recognized that "[a]n unendorsed check made out to a specific person does not have a readily ascertainable market value because there is not much of a commercial market for unendorsed checks." *Simmons v. State*, 109 S.W.3d 469, 473 (Tex. Crim. App. 2003). "Thus, although a check that is made out to 'Ricci Charles Simmons' may have great value to both its maker and its intended recipient, Mr. Simmons, it has very little legal commercial market value unless and until it is endorsed." *Id.* Nevertheless, we noted that "the vast majority of American jurisdictions hold that 'the value of a check, in the absence of proof to show a lesser value, is measured by what the owner of the check could expect to receive for the check at the time of the theft, *i.e.,* the check's face value.'" *Id.* at 474 (quoting *State v. Harris*, 708 So.2d 387, 389 (La. 1998)). Rejecting the notion that Texas is a "minority view" state, we clarified that Texas:

> has followed and does follow the majority rule absent special circumstances. Thus, a check is a "document that represents or embodies value" and checks embody, in . . . all but the exceptional cases, a value equivalent to what is written on their faces. Accordingly, we hold that the face amount of the instrument is presumptive evidence of its value. Assuming that no evidence is produced to rebut the logical inference that the payee was entitled to receive the face amount of the check, it is sufficient evidence of value to show the face amount of the check.

*Id.* at 477–78.

It is true that the checks at issue in *Simmons* were made payable to the defendant in that case, and Francois's check in this case was made payable, not to Appellant, but to the Johnson Family Mortuary. But the fact that Appellant was not the named payee on the cashier's check does not make

*Simmons* distinguishable. In *Cooper v. State*, the defendant stole a number of bills and an unendorsed check from a cash drawer. *Cooper v. State*, 509 S.W.2d 865, 866 (Tex. Crim. App. 1974). The check was made by Frito-Lay, Inc., and was payable to the Rhodes Auto Service in the amount of $51.86. *Id.* After Cooper was arrested, payment on the check was stopped. *Id.* at 867. On appeal, Cooper argued that the unendorsed check had no value. *Id.* We disagreed:

> the evidence was that the check had the value of $51.86 and, upon endorsement, could have been sold for that amount or would have been paid in the sum of $51.86 upon presentation. A check may be the subject of theft, and the fact that the check was not endorsed when it was stolen will not protect appellant.

*Id.* Such is the case here. Francois's cashier's check, upon endorsement, could have been sold for $1,500. It also would have been paid in the sum of $1,500 upon presentation.

In *Simmons*, we recognized that there are exceptions and unusual cases where the evidence can rebut the presumption, such as proof that the maker of the check lacked sufficient funds or that the bank was insolvent. *Simmons*, 109 S.W.3d at 475. In this case, there was no such evidence that rebutted the presumption.

It is also highly doubtful that any such proof which could rebut the *Simmons* presumption, that the face amount of a check is its value, could have been presented in this case. The check in this case was a cashier's check. Unlike a regular check, a cashier's check is drawn by the bank on itself and accepted in advance by the act of its issuance, and it is therefore not subject to countermand by either its purchaser or the issuing bank. *Wertz v. Richardson Heights Bank and Tr.*, 495 S.W.2d 572, 574 (Tex. 1973). A cashier's check is accepted when issued, and section 4.303 of the Business and Commerce Code prevents a bank from making a stop payment order after the cashier's check has

been issued.[3] *Id.*

As we said in *Simmons*, "[c]hecks are negotiable instruments and they play an important role in Texas, American, and international commercial transactions, serving, to a considerable degree, as a cash equivalent." *Simmons*, 109 S.W.3d at 475. To the extent that is true for regular checks, *cashier's checks* are even closer to cash, and our courts have treated cashier's checks as equivalent to cash. *See Dilling v. Nationsbank, N.A.*, 897 S.W.2d 451, 457 (Tex. App.—Waco 1995), *rev'd on other grounds*, 922 S.W.2d 950, 952 (Tex. 1996) (rejecting bank's argument "because of the ease with which cashier's checks are passed, virtually as a cash equivalent, in the business community"); *Arline v. Omnibank, N.A.*, 894 S.W.2d 76, 82 (Tex. App.—Houston [14th Dist.] 1995, no writ) ("Having accepted the check upon issuance, Omnibank's cashier's check was the functional equivalent of cash."); *Angelo v. Chem. Bank and Tr. Co.*, 529 S.W.2d 783, 786 (Tex. App.—Dallas 1975, writ dism'd) ("We hold that where the evidence, as in this case, discloses that plaintiffs tendered a cashier's check, as opposed to a check drawn on plaintiffs' personal account, for the total purchase price, plaintiffs have complied with the requirement of the contract stating that payment was to be made in cash."); *Cmty. Nat'l Bank v. Channelview Bank*, 814 S.W.2d 424, 427 (Tex. App—Houston [1st Dist.] 1991, no writ) ("A cashier's check circulates through commerce as the equivalent of cash."); *see also Tarrant Wholesale Drug Co. v. Kendall*, 223 S.W.2d 964, 967 (Tex. App.—San Antonio 1949, no writ) (in a pre-UCC case, "Cashier's checks are regarded substantially as the money which they represent.").[4]

---

[3] However, in certain narrowly defined circumstances, a bank obligated to pay a cashier's check may have defenses against the person asserting the right to enforce the check. TEX. BUS. & COM. CODE Ann. § 3.411(c).

[4] This "cash equivalent" view of cashier's checks is shared by a majority of jurisdictions. *See generally Stringfellow v. First Am. Nat'l Bank*, 878 S.W.2d 940, 943–44, 943 nn.3–4 (Tenn. 1994) (discussing the "cash equivalent" approach versus the "ordinary negotiable instrument" approach; collecting cases on both sides, including

Thus, contrary to the court of appeals's characterization of Francois's cashier's check as worth "mere pennies," it was worth its face value: $1,500. Regardless of whether Appellant could personally negotiate the cashier's check or not, Francois was deprived of property worth that amount. On that score, I return to section 31.01(4), defining "appropriate":

> (4) "Appropriate" means:
> (A) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or
> (B) to *acquire* or otherwise exercise control over property other than real property.

TEX. PENAL CODE Ann. § 31.01(4) (emphasis added). As written, section 31.01(4)(B) provides two ways of appropriation, either acquiring property or otherwise exercising control over property. The indictment alleged that Appellant appropriated Francois's money "by acquiring or otherwise exercising control over property," and thus the State needed to prove that Appellant either acquired Francois's property or otherwise exercised control over the property. While the court of appeals devoted time and attention to whether Appellant controlled Francois's money through the instrumentality of the check, it did not consider whether he acquired it.

Acquire is not defined in the penal code. When interpreting statutes, we necessarily focus on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). If the meaning of the statutory text, when read using the established canons of construction relating to such text, should have been plain to the legislators who voted on it, we ordinarily give effect to that plain meaning. *Id.* Where application of the statute's plain language would lead to absurd consequences that the Legislature could not possibly have intended, we should not apply the language literally. *Id.*

_____

*Wertz*; and adopting the "cash equivalent" approach in Tennessee).

What is the plain meaning of "acquire"? To "acquire" something is: "to get or gain by one's own efforts or actions . . . to come to have as one's own; get possession of." Houghton Mifflin Harcourt, *Webster's New World College Dictionary* (5th ed. 2016); *see also Acquire*, *Black's Law Dictionary* (10th ed. 2014) ("To gain possession or control of; to get or obtain."). This definition of "acquire" fits the theft statute without causing any absurd consequence: a person who unlawfully possesses, gets, or obtains the property of another, with the intent to deprive that other person of the property, is a thief. Plainly, Appellant came into possession of Francois's check when she handed it to him. Appellant got the check. Appellant obtained the check. He *acquired* the check when Francois gave it to him, and, consequently, he *appropriated* the check.

For all of these reasons: (1) allegation of theft of money and proof of theft of a check is not a fatal variance; (2) *Orr* does not apply because the check was deposited into the business account, which was owned by Appellant's wife; (3) even if the "controller" of the check was the business, Appellant had a significant hand in running the business; (4) the business was an LLC owned by Appellant's wife and Texas is a community property state; and (5) Appellant acquired Francois's money in the form of the check, I believe the evidence is sufficient to show that Appellant appropriated Francois's money. Therefore, the guilty verdict on Count I—theft of Francois's money—is supported by sufficient evidence. The court of appeals erred in finding otherwise.

## Conclusion

In conclusion, the jury found Appellant guilty on a charge that authorized conviction as a primary actor, and the evidence is sufficient to support that verdict. Appellant appropriated Francois's money when he acquired her cashier's check. As for the other elements of theft, I agree with the analysis and conclusion of both the majority opinion and Judge Yeary's concurring opinion

that Appellant's appropriation was unlawful, and, at the time he unlawfully appropriated Francois's property, Appellant had the requisite intent to deprive. Because there is sufficient evidence to show that Appellant was guilty as a primary actor, we need not delve into whether the evidence is also sufficient to show he was guilty as a party. *Vasquez v. State*, 665 S.W.2d 484, 487 (Tex. Crim. App. 1984), *disapproved on other grounds by Gonzales v. State*, 723 S.W.2d 746, 751 (Tex. Crim. App. 1987) ("If there is sufficient evidence to prove one of the two ways of committing the offense, this Court need not consider whether the evidence is also sufficient to prove the alternative theory.").[5] The majority and concurring opinions' discussion of whether Appellant is guilty on Count I as a party is unnecessary. I concur in the Court's decision to reverse as to Count I, and I join the majority opinion as to Count II.

Filed: Nov. 7, 2018
Publish

---

[5]  *See also Pinkerton v. State*, 660 S.W.2d 58, 62 (Tex. Crim. App. 1983) ("Since the State proved murder during the course of burglary, we need not consider whether the evidence is sufficient to show murder during the course of robbery."); *Wright v. State*, 364 S.W.2d 384, 387 (Tex. Crim. App. 1963) ("There being sufficient evidence to support a finding by the jury that appellant obtained carnal knowledge of the prosecutrix without her consent by threats to kill her, while holding a knife at her side, we need not pass upon the question of whether the prosecutrix offered the resistance required where the state relies upon rape by force or by a combination of force and threats.").